IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 19, 2008

Charles R. Fulbruge III
Clerk

No. 06-50748

AMIGO BROADCASTING, LP

Plaintiff–Appellant

v.

SPANISH BROADCASTING SYSTEM, INC.; RAUL BERNAL; JOAQUIN
GARZA

Defendants–Appellees

Appeal from the United States District Court
for the Western District of Texas

Before GARWOOD, GARZA, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

This case stems from the termination of an employment relationship
between Appellant Amigo Broadcasting, LP ("Amigo") and Appellees Joaquin
Garza ("Garza") and Raul Bernal ("Bernal"), and Garza and Bernal's decision to
enter into a new employment relationship with Appellee Spanish Broadcasting
System, Inc. ("SBS"). Amigo seeks a reversal of the district court's grant of
judgment as a matter of law in favor of Appellees. Amigo contends that the
district court erred in its ruling by finding that: (1) Amigo failed to produce
legally sufficient evidence that Garza and Bernal breached their employment
agreements with Amigo; (2) Amigo failed to produce legally sufficient evidence
that SBS tortiously interfered with Amigo's employment agreements with Garza

and Bernal; and (3) Amigo withdrew its Lanham Act and misappropriation/unfair competition claims during the hearing on Appellees' motions for judgment as a matter of law. For the following reasons, we AFFIRM in part and REVERSE and REMAND in part.

## I. BACKGROUND

In the early 1990s, Garza created the Spanish-language radio show "El Chulo y La Bola" ("the Show" or "the El Chulo Show"). Garza created and plays the character "El Chulo," and Bernal plays a variety of other fictional characters. In April 2002, Amigo executed three-year employment agreements (the "Employment Agreements") with Garza and Bernal, whereby Garza and Bernal agreed to broadcast the Show on Amigo's Spanish-language radio station, KHHL, in Austin, Texas. Amigo aggressively promoted the Show, and, according to Amigo, it soon became "very successful and consistently achieved high revenues and ratings."

Additionally, the Show was very successful at stations where it was being syndicated. In order to increase syndication, Amigo contracted with Latin Entertainment Network ("LEN") to syndicate the Show for a period of three years. Tony Hernandez ("Hernandez") was the CEO of LEN. In May or June of 2003, Amigo terminated its relationship with LEN and Hernandez, and it took over all syndication of the Show.

Meanwhile, according to SBS, Hernandez was attempting to find a new radio group to do business with. Between February and August 2003, he sent numerous e-mails and letters to SBS, making various business proposals, including one to broadcast the Show from Los Angeles. Raul Alarcon ("Alarcon"), President and Chairman of the Board of SBS, responded to Hernandez in late October/early November of 2003. Thereafter, on November 12, Alarcon, Hernandez, Garza, and Bernal met in SBS's office in Miami, Florida (the "Miami meeting").

On or before November 12, Amigo's then-president Chuck Brooks ("Brooks") learned about the Miami meeting. In response, Jim Anderson ("Anderson"), Amigo's CEO, sent SBS a letter on November 12 asking SBS not to interfere with Garza's and Bernal's Employment Agreements with Amigo. SBS did not respond to this letter.

On November 18, SBS's in-house attorney, James Cueva ("Cueva"), began drafting standard employment agreements for Garza and Bernal. Cueva also requested copies of Garza's and Bernal's Employment Agreements with Amigo "to see whether the Agreements really existed and, if so, whether they prevented Garza and Bernal from leaving Amigo to work for SBS." According to SBS, it "concluded that Garza and Bernal could resign from Amigo and that the non-compete clause would not prohibit them from going on-air for SBS in Los Angeles or any other SBS market because SBS and Amigo did not compete in the same markets."

On November 24, SBS sent employment agreements to Garza and Bernal (the "SBS Employment Agreements"), offering them substantial increases in salaries and bonuses. Garza and Bernal did not perform the Show for Amigo on November 25 and 26.[1] According to Amigo, the day after Garza and Bernal failed to report to work, Bernal informed Amigo that he and Garza had accepted positions with SBS and refused to perform the El Chulo Show. When Brooks contacted Garza, Garza allegedly told Brooks that they did not need him anymore, said "Fuck you," and hung up the phone. On December 12, Amigo terminated Garza and Bernal effective November 26 and 27, respectively, for "job abandonment." On December 19, Garza and Bernal signed the SBS

---

[1] Appellees contend that Garza and Bernal did not perform the Show on November 24 and 25. There is sufficient evidence in the record, however, establishing that they did not perform the Show on November 25 and 26.

Employment Agreements and began broadcasting the Show for SBS in Los Angeles.

Based on the foregoing, Amigo sued Garza, Bernal, SBS, LEN, and Hernandez for breach of contract, misappropriation/unfair competition, conversion, breach of fiduciary duty, constructive trust, invasion of privacy by misappropriation, violation of the Lanham Act, and tortious interference with a contract. LEN and Hernandez ultimately settled with Amigo. A jury trial began on May 2, 2006. At the close of Amigo's evidence, Appellees filed motions for judgment as a matter of law, which the district court granted. Amigo now appeals, asserting that the district court erred by: (1) dismissing Amigo's breach of contract claims against Garza and Bernal; (2) dismissing Amigo's tortious interference claim against SBS; and (3) finding that Amigo withdrew its Lanham Act and misappropriation/unfair competition claims.

## II. STANDARD OF REVIEW

We review a district court's grant of judgment as a matter of law de novo, applying the same legal standard as the district court. Price v. Marathon Cheese Corp., 119 F.3d 330, 333 (5th Cir. 1997). Judgment as a matter of law is appropriate after "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). "In evaluating such a motion, the court must consider all of the evidence in the light most favorable to the nonmovant, drawing all factual inferences in favor of the non-moving party, and leaving credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts to the jury." Price, 119 F.3d at 333. Although the Court "should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe"–that is, the Court "should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party

4

that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000) (internal quotations omitted).

## III. DISCUSSION

### A. Amigo's Breach Of Contract Claims

Amigo asserts that Garza and Bernal breached their Employment Agreements by: (1) resigning prior to the expiration of the "Initial Term" and (2) allowing SBS to use Garza's and Bernal's "names and/or likenesses" for business purposes without Amigo's consent. It is undisputed by the parties that Texas law governs Amigo's breach of contract claims. Under Texas law, the court must submit Amigo's breach of contract claims to the jury if Amigo presented legally sufficient evidence of: "1) the existence of a valid contract; 2) performance or tendered performance by the plaintiff; 3) breach of the contract by the defendant; and 4) damages to the plaintiff resulting from the breach." Lewis v. Bank of Am. NA, 343 F.3d 540, 544-45 (5th Cir. 2003). It is undisputed for the purposes of this appeal that Amigo presented sufficient evidence to establish elements one and two.

#### 1. Garza And Bernal's Resignation

##### a. Sufficiency of the Evidence of Breach of Contract

Amigo argues that the district court incorrectly interpreted the Employment Agreements to give Garza and Bernal the right to resign at any time without breach. Under Texas law, "[d]etermining whether a contract is unambiguous and interpreting an unambiguous contract are questions of law." Cedyco Corp. v. PetroQuest Energy, LLC, 497 F.3d 485, 490 (5th Cir. 2007) (citing Heritage Res., Inc. v. NationsBank, 939 S.W.2d 118, 121 (Tex. 1996)). In interpreting a written contract, "[t]he court's primary concern is to enforce the parties' intent as contractually expressed, and an unambiguous contract will be enforced as written." Interstate Contracting Corp. v. City of Dallas, 407 F.3d

708, 712 (5th Cir. 2005). To achieve this objective, "courts should examine and consider the entire writing in an effort to harmonize and give effect to all of the provisions of the contract so that none will be rendered meaningless." Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). An ambiguity in a contract "arises only after the application of established rules of construction leaves an agreement susceptible to more than one [reasonable] meaning." DeWitt County Elec. Coop., Inc. v. Parks, 1 S.W.3d 96, 100 (Tex. 1999).

Amigo contends that it produced sufficient evidence that Garza and Bernal breached their Employment Agreements by resigning[2] before the expiration of the "Initial Term" set forth in Section 1.3.[3] Under Section 1.3, the Initial Term was "subject to earlier termination in accordance with the provisions of Section 1.6." Section 1.6 sets forth the ways in which the Employment Agreements can

---

[2] There is some dispute as to whether Garza and Bernal resigned or whether Amigo terminated them for "job abandonment." Although Amigo ultimately terminated Garza and Bernal for "job abandonment" on December 12, 2003, Amigo produced sufficient evidence for a jury to conclude that Garza and Bernal resigned well before then. Specifically, Brooks testified that: Garza and Bernal did not perform the Show for Amigo beginning on November 25; the day after Garza and Bernal failed to report to work, Bernal informed Amigo that he and Garza had accepted positions with SBS and refused to perform the El Chulo Show; and when Brooks contacted Garza, Garza told Brooks that they did not need him anymore, said "Fuck you," and hung up the phone.

[3] Section 1.3 states:

> This Agreement shall become effective as of the Effective Date and shall continue in force and effect for a term of three years (the "Initial Term") subject to automatic extension of the term hereof for an additional one year period from year to year thereafter (the "Extended Term") unless either party notifies the other party in writing at least 60 days prior to the expiration of the Initial Term or any Extended Term (collectively, the "Term") . . . , subject to earlier termination in accordance with the provisions of Section 1.6 hereof.

It is undisputed that the Initial Term expired in April 2005, and Garza and Bernal stopped working at Amigo in late November 2003.

be terminated without breach.[4] Because Garza and Bernal's termination of employment did not fall under Section 1.6, Amigo contends that such termination constituted sufficient evidence of a breach of the Employment Agreements.

Garza and Bernal, on the other hand, contend–and the district court found–that they did not breach the Employment Agreements by resigning because they were employees at will. Garza and Bernal argue that Section 1.7(a) unambiguously acknowledges their right to resign. Section 1.7(a) of the Employment Agreements states in part:

> In the event Employee's employment hereunder is terminated pursuant to the provisions of Section 1.6 hereof due to the death, disability, for cause or the resignation of Employee, Employer shall have no further obligation to Employee . . . [except to pay accrued but unpaid amounts due].

(emphasis added). Garza and Bernal argue that the purported right to resign in Section 1.7(a) is consistent with Section 1.6 because Section 1.6 does not limit the ability of the Employee to resign, but rather only limits the Employer's right to terminate the Agreement.

Garza and Bernal's argument, however, is unpersuasive. Under Texas law, employment is "at will, terminable at any time by either party, with or without cause, absent an express agreement to the contrary." Fed. Express Corp.

---

[4] Section 1.6 states:

This Agreement and Employee's employment hereunder may be terminated without any breach of this Agreement at any time during the Term hereof only by reason of:
(a) The death of Employee;
(b) The inability of Employee due to injury, illness or other incapacity (physical or mental) to perform . . . ;
(c) For Cause which shall mean termination of Employee's employment upon written notice to Employee limited, however, to . . . [gross neglect, indictment on felony charges, or disclosure of Trade Secrets]; or
(d) Upon 30 days written notice to Employee at any time after the expiration of the Initial Term but not prior to the expiration of the Initial Term.

v. Dutschmann, 846 S.W.2d 282, 283 (Tex. 1993). For the reasons stated by Amigo, the Employment Agreements constitute "express agreement[s] to the contrary."

The plain, unambiguous language of Section 1.6 limits the ways in which Garza's and Bernal's employment "may be terminated without any breach," and there is simply nothing to substantiate Garza and Bernal's claim that Section 1.6 addresses only Amigo's right to terminate the Agreements.[5] Garza and Bernal's argument relies on the idea that the language "may be terminated" in Section 1.6 can only mean "may be terminated by Employer." It is clear, however, that the absence of the language "by Employer" indicates that Section 1.6 applies to termination by both Employer and Employee.[6] Black's Law Dictionary 1511 (8th ed. 2004) defines "terminate" as "[t]o put an end to; to bring to an end" and defines "termination of employment" as "[t]he complete severance of an employer-employee relationship." These definitions indicate that termination of employment can be effectuated by either an employer or an employee. Furthermore, and most importantly, where the contract intended to refer to termination of employment by the employer, it unambiguously stated as such. Section 1.7(a) states in a part not cited by Garza and Bernal: "In the event

---

[5] Garza and Bernal argue that interpreting Section 1.6 to limit their right to resign would be unreasonable because, according to this construction, they would be unable to resign if "Amigo drastically expanded Garza's and Bernal's work requirements, lost its FCC license and went off the air, filed for bankruptcy, or adopted an English-language programming format." This argument is unconvincing. First, Section 1.2 limits the duties of Garza and Bernal to those that may "be reasonably assigned" to them, such that drastically expanded work requirements and requiring Garza and Bernal to perform the show in English would arguably not be "reasonably assigned" duties, constituting breach of the Employment Agreements by Amigo. Second, unforeseen events–such as the loss of Amigo's FCC license or bankruptcy–rendering performance impracticable are excused as a matter of law. See Tractebel Energy Mktg., Inc. v. E.I. Du Pont De Nemours & Co., 118 S.W.3d 60, 64-65 (Tex. App. 2003).

[6] Although only the employer can terminate the employment relationship pursuant to some subsections of Section 1.6, both the employer and employee can terminate the employment relationship under Section 1.6(b), which deals with employee disability.

Employee's employment hereunder is terminated by Employer . . . ." (emphasis added). If the concept of termination necessarily implied termination by the Employer, the use of the language "by Employer" in Section 1.7(a) would have been wholly unnecessary.

Furthermore, Section 1.7(a) does not create or acknowledge a right for Garza and Bernal to resign from Amigo without breaching the Employment Agreements; rather, the purpose of Section 1.7(a) is to determine what compensation Amigo would owe Garza and Bernal upon termination of the employment relationship.[7] Quite simply, reading Section 1.7 to create or acknowledge a right to resign without breach would contradict the plain language of Section 1.6–if resigning or abandoning employment prior to the end of the Initial Term was an option for termination of employment without breach, such would have been set forth in Section 1.6.

Finally, the term of the agreement is only "subject to earlier termination in accordance with the provisions of Section 1.6 hereof." If the term were subject to earlier termination because of employee resignation, Section 1.3 or 1.6 would have undoubtedly stated as such.

Thus, interpreting the Employment Agreements as limiting Garza's and Bernal's right to terminate the agreement at will best gives effect to "the entire writing" and best harmonizes "all the provisions of the contract." Coker, 650 S.W.2d at 393. The district court, therefore, erred by interpreting the Employment Agreements to the contrary, and Amigo produced sufficient evidence that Garza and Bernal breached their Employment Agreements.

b. Sufficiency of the Evidence of Damages

---

[7] Admittedly, it is somewhat unclear what "resignation" in Section 1.7(a) encompasses. It is reasonable, however, that resignation refers to severance of the employment relationship by the employee, regardless of whether such severance constitutes a breach of the Employment Agreement. This interpretation, as opposed to the interpretation proffered by Garza and Bernal, is consistent with the plain language of Sections 1.3 and 1.6.

Amigo asserts that it provided sufficient evidence that Garza and Bernal's resignation proximately caused it substantial damages. Specifically, Amigo contends that it produced sufficient evidence of: (1) $721,000 in lost profits and (2) $250,000 in lost investment that Amigo spent to advertise the Show.[8] Garza and Bernal, however, contend that Amigo presented insufficient evidence of both the fact and amount of damages.

### i. Lost profits

Under Texas law, the measure of breach-of-contract damages is "just compensation for the loss or damage actually sustained." Stewart v. Basey, 245 S.W.2d 484, 486 (Tex. 1952). "A proper measure of damages in a breach of contract case is the loss of contractual profit." Interceramic, Inc. v. S. Orient R.R. Co., 999 S.W.2d 920, 928 (Tex. App. 1999). The ability to recover lost profits "does not require that the loss be susceptible to exact calculation." Szczepanik v. First S. Trust Co., 883 S.W.2d 648, 649 (Tex. 1994) (per curiam). The injured party must, however, establish the amount of the loss "by competent evidence with reasonable certainty." Id. Quite simply, lost profit damages "may not be based on evidence that is speculative, uncertain, contingent, or hypothetical." Blase Indus. Corp. v. Anorad Corp., 442 F.3d 235, 238 (5th Cir. 2006). "At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained." Szczepanik, 883 S.W.2d at 649. However, "[w]hile some uncertainty as to the amount of damages is permissible, uncertainty as to the

---

[8] In its opening brief, Amigo seems to assert that SBS's unjust enrichment could be used as a measure of damages for Garza's and Bernal's alleged breaches of contract. However, in its reply brief, Amigo makes clear that its evidence of SBS's profits is for its tortious interference claim, at least in the event Amigo cannot sufficiently prove its lost profits. See Sandare Chem. Co. v. WAKO Int'l, Inc., 820 S.W.2d 21, 24 (Tex. App. 1991) ("[I]n a case of tortious interference with contractual relations, evidence of the defendant's profits may, when the plaintiff cannot show with certainty the profits it would have realized in the absence of the interference, constitute evidence of the plaintiff's lost profits.").

fact of damages will defeat recovery." Blase Indus. Corp., 442 F.3d at 238 (emphasis added).

Having reviewed the record, we find that Amigo presented sufficient evidence of the fact of damages. Brooks, Amigo's then-president, testified at trial: the El Chulo Show was "wildly successful . . . in terms of ratings and revenues"; advertisers and sellers of advertising use Arbitron ratings to determine the cost of advertising; KHHL received more advertising, charged higher advertising rates, and consequently generated more revenue as a result of the high Arbitron ratings from the El Chulo Show; the show Amigo used to replace the El Chulo Show after its departure was not nearly as successful as the El Chulo Show until the end of 2004;[9] the winter ratings of KHHL for 2004 reflected the loss of the Show and consequently dropped "from around 3.9 or a four to a 1.4"; and this drop in ratings caused revenues to "drop[] like a rock." Specifically, Brooks testified that Amigo's syndicated advertising revenue decreased from around $350,000 in 2003 to $11,000 in 2004 and testified that this decrease was directly due to the loss of the Show.[10] Furthermore, Amigo's damages expert, Robert Rea, testified that "ratings equal revenue" and that a significant drop in ratings–such as the one sustained by Amigo after the loss of the Show–will inevitably "create a very, very large decrease in revenue."

Garza and Bernal, however, assert that Amigo did not produce sufficient evidence of the fact of damages because: (1) four months after the loss of the Show–in April and May 2004–KHHL had the two most profitable months in its

---

[9] Brooks testified that even at the end of 2004, the ratings for the replacement show were only "probably 80 to 85 percent of . . . the El Chulo program." Amigo replaced the El Chulo Show with its highly rated afternoon show, which forced Amigo to then find a new afternoon host. Essentially, according to Brooks, "we had to switch all of our hosts around when [Garza] left," resulting in "a completely different radio station that had to be built."

[10] Brooks stated: "That advertising went away because El Chulo, [Garza], was doing most of the commercials live."

history; (2) the decrease in revenue Amigo attributes to the loss of the Show did not actually begin until June 2004–six months after the loss of the Show; and (3) the decrease in revenue occurred "around the same time that Amigo got a new station manager, moved its tower, and announced it was going to sell its station." Brooks's testimony, however, explains why high profits in April and May 2004 and a decrease in revenue beginning in June 2004 are consistent with the loss of the Show in late November 2003. Brooks testified that: the high fall 2003 ratings were the result of the success of the El Chulo Show and were released in January 2004; the low 2004 winter ratings were the result of the loss of the Show and were not released until April 2004; Amigo used the high fall 2003 ratings to sell advertising through May 2004 (before the winter ratings were released);[11] and had the Show remained at KHHL, the profits from April and May 2004 would have continued.[12]

Garza and Bernal's third argument regarding a new station manager, a tower move, and Amigo's announcement that it intended to sell KHHL is also unpersuasive. First, Garza and Bernal fail to explain how any of these events negatively impacted revenues at KHHL. Second, with respect to the tower move, Brooks testified that the tower move did not cause any loss of profit, and Rea testified that the tower move was a neutral issue. Finally, Garza and Bernal's argument is essentially a claim that Amigo did not produce sufficient evidence that the loss of the Show caused the decrease in revenue beginning in June 2004. To prove causation, Amigo need not "negative entirely the possibility that

---

[11] Brooks also testified that April and May are "good months for Spanish radio because of Cinco de Mayo, and advertisers really put a lot of emphasis on–on Cinco de Mayo."

[12] Brooks did admit on cross-examination that Arbitron provides trends of ratings to radio stations on a monthly basis and that advertising agencies sometimes get the monthly trends. Although this implies that Amigo's advertisers should have known about KHHL's decreasing ratings before April 2004 and Amigo's revenues should have decreased before June 2004, Brooks testified that the monthly trends are not "what the [radio stations] sell off of or what the advertisers buy off of"; rather, advertisers "buy off of a complete rating period."

[Garza's and Bernal's] conduct was not a cause [of the revenue loss]"; rather, "it is enough to introduce evidence from which reasonable persons may conclude that the [loss of revenue] was caused by [Garza and Bernal's departure]." Havner v. E-Z Mart Stores, Inc., 825 S.W.2d 456, 460 (Tex. 1992). Viewed in the light most favorable to Amigo, Brooks's testimony that the decrease in ratings after the departure of the El Chulo Show caused significant decrease in advertising revenues is certainly sufficient–especially given that this causal claim is "inherently plausible." See Univ. Computing Co. v. Mgt. Sci. Am., Inc., 810 F.2d 1395, 1401 (5th Cir. 1987) ("If a causal mechanism is inherently plausible–if it comports with customary experience–we can make the inference (that the mechanism in fact caused the harm) on less evidence than if the mechanism is less plausible.").

We also find that Amigo produced sufficient evidence of the amount of damages. Amigo's damages expert, Rea, testified that: he arrived at an estimate of $721,000 in lost profit damages by using the yardstick method; the yardstick method was the most appropriate method for a growing business; he considered the historical financial data for KHHL and ABS Services (which syndicated the El Chulo Show); determined that 16 percent was the appropriate growth rate for the revenue of these entities; and calculated an estimate of lost profit based on these numbers and projections. Such an estimate was not merely speculative or conjectural but was "based on objective facts, figures, or data." Szczepanik, 883 S.W.2d at 649.

Garza and Bernal, however, contend that Rea's $721,000 estimate was not reasonably certain because: (1) Rea's 16 percent growth projection was purely speculative and (2) Rea's estimate was based on the revenues of KHHL and ABS Services as a whole, not the revenues of the El Chulo Show, and Rea simply assumed that any loss in revenues for these entities would have been attributable to the loss of the Show. First, with respect to Rea's 16 percent

13

projected growth estimate, Rea testified that he considered the growth of the Spanish broadcasting industry, the Spanish radio industry, and public companies in the Spanish radio industry. Second, with respect to basing his estimates on the revenues of KHHL and ABS Services, Rea testified that this method was appropriate under the circumstances.[13] Furthermore, Garza and Bernal's argument constitutes a criticism of the bases and sources of Rea's opinion, Rea's testimony already withstood a Daubert challenge, and Garza and Bernal's renewed criticism merely "affect[s] the weight to be assigned to that opinion . . . and should be left for the jury's consideration." Viterbo v. Dow Chem. Co., 826 F.2d 420, 422 (5th Cir. 1987) (emphasis added).

Finally, Garza and Bernal argue that Amigo may not recover lost profit damages because KHHL was a "start-up company" that was "less than 20 months into its business plan," and, as a matter of Texas law, "[p]rofits which are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on . . . entry into unknown or unviable markets, or on the success of a new and unproven enterprise, cannot be recovered." Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc., 877 S.W.2d 276, 279 (Tex. 1994). However, "[w]hen there are firm[] reasons to expect a business to yield a profit, the enterprise is not prohibited from recovering merely because it is new." Id. at 280. Given Brooks's and Anderson's statements about the success of KHHL and the El Chulo Show, and given that Amigo's financial statements show that KHHL consistently generated profits beginning in July 2002, there were certainly "firm[] reasons to expect [KHHL and the El Chulo Show] to yield a profit." Id.

---

[13] Specifically, Rea testified that ABS Services was "simply terminated" after the El Chulo Show left, and Brooks testified that after the El Chulo Show left, KHHL moved its afternoon show to the morning and had to find a new afternoon show, effectively making KHHL "a completely different radio station." Thus, basing damages estimates on the losses of KHHL and ABS Services was not unreasonable under the circumstances.

ii. Lost investment

Amigo also asserts that it produced sufficient evidence of its loss of $250,000, which constitutes the lost investment that Amigo spent to advertise and promote the El Chulo Show. With respect to such investment, Amigo is seeking reliance damages which "reimburse one for expenditures made towards the execution of the contract in order to restore the status quo before the contract." Hart v. Moore, 952 S.W.2d 90, 97 (Tex. App. 1997). Although not stated by Amigo's briefs, Amigo's evidence of lost investment presents an alternative theory of recovery—that is, Amigo can ultimately recover for its lost profits or its lost investment but not both. See Restatement (Second) of Contracts § 349 (1981) ("As an alternative to [expectation damages], the injured party has a right to damages based on his reliance interest . . . .").[14]

Amigo presented sufficient evidence of its reliance damages. Brooks testified that Amigo spent approximately $250,000 in advertising the El Chulo Show. Further, Brooks's December 10, 2003, e-mail to Garza stated that Amigo's investment in the Show "has been wasted since you [Garza] elected, with no warning, to stop showing up for work." Finally, Anderson testified that building an audience for a radio show requires a significant investment, and this investment is "lost" if the show and its performers can simply leave at will.[15]

---

[14] It can be argued that one Texas case suggests that an award of damages for breach of contract may include both reliance and expectation damages. After noting that damages for breach of contract traditionally protect three interests: restitution, reliance, and expectation, the court in Qaddura v. Indo-European Foods, Inc., postulated that "[i]n an appropriate case, just compensation may require an award protecting one or more of these interests." 141 S.W.3d 882, 888 (Tex. App. 2004) (emphasis added). To the extent this statement suggests an award of both reliance and expectation damages in "appropriate case[s]," we recognize that this is not an appropriate case for such an award. The proper calculation of Amigo's measure of expectation damages, its lost profit, necessarily includes its reliance measure, the cost borne by Amigo in promoting the El Chulo Show. Therefore, recovery of both is not necessary to ensure just compensation in this case.

[15] Specifically, Anderson testified:

This evidence is sufficient for a reasonable jury to conclude that Amigo's promotional investment in the Show was approximately $250,000, was spent in reliance on Garza and Bernal performing the Show for Amigo during the term of their contractual agreements, and that promotional investment was in effect lost because of Garza and Bernal's early departure.

Garza and Bernal, however, argue that Amigo's evidence was legally insufficient because Amigo did not present evidence that it was unable to recoup its promotional investment. Specifically, Garza and Bernal assert that the evidence shows that the El Chulo Show generated profits substantially in excess of $250,000, such that Amigo recouped its advertising investment. First, as explained above, Amigo introduced some evidence–albeit somewhat conclusory–that the promotional investment was "wasted" or "lost" as a result of Garza and Bernal's early departure. Second, it is the burden of Garza and Bernal, not Amigo, to show that Amigo received a benefit from its expenditures that reduce or offset the amount of reliance damages to which Amigo claims it is entitled. 22 Am. Jur. 2d Damages § 51 (2003) ("Recovery of reliance damages may be reduced to the extent that a breaching party can prove that a 'deduction' is appropriate for any benefit that the claimant received for salvage or otherwise.") (emphasis added) (citing DPJ Co. Ltd. P'ship v. FDIC, 30 F.3d 247, 250 (1st Cir. 1994)); cf. Restatement (Second) of Contracts § 349 ("[T]he injured party has a right to damages based on his reliance interest . . . less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed.") (emphasis added). Even if it

It's very difficult to develop an audience and we often spend lots of money trying to develop an audience for a particular show. So if that show could move across the street to–to a competing radio station, then all of that investment is just lost. So there's–there's sort of a trade off. We–in the industry, you tend to promise talent and guarantee employment for a period of years in exchange for staying for a period of years for not competing, not walking across the street to and kind of taking all of that investment with them.

is undisputed that the El Chulo Show generated profits greater than $250,000, there is no evidence regarding what portion of those profits are attributable to Amigo's promotional investment. Thus, Amigo produced sufficient evidence of its reliance damages, and Garza and Bernal can introduce evidence at trial establishing that Amigo's promotional investment in the El Chulo Show generated substantial profits that reduce or completely offset the amount Amigo seeks in reliance.

In conclusion, Amigo presented sufficient evidence that Garza and Bernal breached their Employment Agreements by resigning in November 2003. Further, Amigo produced sufficient evidence to allow it to pursue its lost profits or, in the alternative, its lost investment to compensate it for Garza and Bernal's breach. Thus, with respect to this claim for breach of contract, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

2. The License Agreement

a. Sufficiency of the Evidence of Breach of the License

Amigo argues that Garza and Bernal also breached their Employment Agreements by allowing SBS to use their names and likenesses for commercial purposes without Amigo's consent. Amigo contends that this was a breach of the License set forth in Section 1.1, which states:

> Employee hereby grants Employer a nonexclusive[16] royalty free license to use Employee's name and/or likeness to promote [KHHL] and its programming, including any program hosted by Employee or syndicated by Employer, during the term of this Agreement and any period thereafter during which Employee is prohibited from competing with Employer as set forth in Section 1.8(b) hereof.[17]

---

[16] According to Amigo, the License is "nonexclusive" because "it covers only commercial or business purposes, not personal or charitable uses."

[17] Section 1.8(b) establishes that a covenant not to compete with Amigo shall last for "12 months following Employee's termination of employment with Employer."

During [this period], employee shall not permit any other party to use Employee's name and/or likeness for commercial or other business purposes without first obtaining the written consent of Employer . . . .

In response, Garza and Bernal contend–and the district court found–that the License in Section 1.1 was only enforceable during Garza's and Bernal's employment at Amigo. Specifically, Garza and Bernal argue that, because Section 1.1 grants Amigo a licence that remains in effect for 12 months after termination of the Employment Agreements, it constitutes a restraint on trade unrestricted in scope or geographic area and is unenforceable under Texas law. Even if Garza and Bernal are correct that the License is unenforceable for the 12 months after the term of the Employment Agreements expires, the License was still in effect under Section 1.1 "during the term of this Agreement," and the term of the Employment Agreements was at least three years–until April 2005. Under Section 1.3, the term of the Employment Agreements could only be cut short "in accordance with the provisions of Section 1.6." Because we already determined that Garza's and Bernal's resignations were not in accordance with Section 1.6, their resignations did not cut the Initial Term–and accordingly the term of the License–short. Furthermore, even if the License acts as a restraint on trade during the term of the Employment Agreements, such a restraint is not impermissible and does not violate public policy. 42 Am. Jur. 2d Injunctions § 130 (2003) ("Covenants not to accept employment with anyone but the employer during the term of the contract are not opposed to public policy and have been held to be valid.") (emphasis added); cf. Mission Indep. School Dist. v. Diserens, 188 S.W.2d 568, 569-70 (Tex. 1945) (granting an injunction preventing a former employee from performing services for another employer during the term of her

employment agreement where performance of such services constituted a breach of contract and the employee's services were special, unique, or extraordinary).[18]

Thus, the License was enforceable until at least April 2005, and it is undisputed that SBS used Garza's and Bernal's radio names and likenesses for business purposes without Amigo's permission prior to April 2005.

Garza and Bernal, however, further contend–and the district court found–that the "names" referred to in the License are unambiguously their legal names, not their radio names, and, thus, they were not in breach of the License by allowing SBS to use their radio names. Amigo, on the other hand, argues that the term "names" in Section 1.1 creates a latent ambiguity–as Garza and Bernal had legal names and radio names–and this latent ambiguity precluded the district court from granting judgment as a matter of law.

Whether a contract is ambiguous is "a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." Coker, 650 S.W.2d at 394. A latent ambiguity exists if "the meaning of language used in a written agreement becomes uncertain when applied to the subject matter of the contract." Loaiza v. Loaiza, 130 S.W.3d 894, 905 (Tex. App. 2004), cited in Dell Computer Corp. v. Rodriguez, 390 F.3d 377, 389 n.24 (5th Cir. 2004) (emphasis added). The latent ambiguity, however, "must become evident when the contract is read in the context of the surrounding circumstances, not after parol evidence of intent is admitted to create an ambiguity." Nat'l Union Fire Ins. Co. v. CBI Indus., Inc., 907 S.W.2d 517, 521 (Tex. 1995) (emphasis added). Thus, in determining whether a latent ambiguity exists, courts may examine "surrounding circumstances" and "the subject matter of the contract." Loaiza, 130 S.W.3d at 905.

---

[18] It seems clear that Garza and Bernal, as on-air radio talent, performed special, unique, or extraordinary personal services for Amigo.

Examining the "surrounding circumstances" and "the subject matter of the contract," the License in Section 1.1 creates a latent ambiguity. Although only Garza's and Bernal's legal names were used in the text of the contract, the Employment Agreements concerned the employment of two radio personalities to perform their radio show entitled "El Chulo y La Bola,"[19] and the License concerned the promotion of KHHL and its programming, including the Show. Garza and Bernal have two sets of names–their legal names and their radio names–and their radio names were the names used to promote the Show.[20] Thus, when applying the word "name" in Section 1.1 to Garza and Bernal, it is uncertain whether "name" refers to Garza's and Bernal's legal or radio name, and a latent ambiguity exists.

Because of this latent ambiguity and because SBS used Garza's and Bernal's radio names and likenesses while the License was in effect, the district court erred in determining that Amigo failed to produce sufficient evidence of breach of the License. See Dell Computer Corp., 390 F.3d at 388-89 & n.25 (holding that where a latent ambiguity exists, interpretation of the contract becomes a question of fact).

    b. Sufficiency of the Evidence of Damages

Although Amigo presented sufficient evidence that Garza and Bernal breached the License, the district court was correct in dismissing this claim

---

[19] Although the Employment Agreements only employ Garza and Bernal as "morning show host[s]" and do not explicitly state that Garza and Bernal are to perform the "El Chulo y La Bola" show, it is obvious from the surrounding circumstances that the subject matter of the contract was the El Chulo Show–the only radio program Garza had ever hosted was the El Chulo Show and, at the time of the contract, Garza and Bernal had already been performing the El Chulo Show for Amigo since mid-2001.

[20] It is undisputed that Garza's radio name is "El Chulo." Although it is disputed that Bernal had a radio name, Amigo presented sufficient evidence that Bernal's radio name is "La Bola." Specifically, Hernandez testified (by deposition summary) that: Bernal's radio name is "La Bola"; that he did not even know Bernal's real name; and Bernal chose the name "La Bola" because it literally means "the ball," which was a humorous reference to Bernal's physical size.

because Amigo failed to provide sufficient evidence that breach of the License caused Amigo any damages.

On appeal, Amigo asserts that its damages from Garza and Bernal's breach of the License are exactly the same as its damages from Garza and Bernal's untimely resignation—that is, lost profits and, in the alternative, lost investment. These asserted damages, however, were caused solely by the loss of the El Chulo Show, which resulted from Garza and Bernal's resignation, not from any subsequent breach of the License.[21]

Accordingly, Amigo cannot recover its asserted lost profits for breach of the License because its alleged lost profits stem solely from the untimely loss of the Show. Amigo does not assert that it lost any profits due to Garza and Bernal's subsequent breach of the License. For instance, Amigo does not assert that Garza and Bernal's breach of the License allowed SBS to compete with KHHL, thereby further diminishing KHHL's profits.

Furthermore, Amigo cannot recover its lost investment in the Show on the basis of the License because it did not produce any evidence that it made this investment in reliance on the License agreement. Instead, Amigo's evidence—specifically, Anderson's testimony quoted in footnote 15 supra—indicates that Amigo made its investment in the Show in reliance on the three-year contract term and the covenant not to compete contained in the Employment Agreements.

Thus, with respect to Amigo's claim for breach of the License, we AFFIRM the judgment of the district court.

B. Amigo's Tortious Interference With Contract Claim

---

[21] Amigo lost the Show when Garza and Bernal stopped performing the Show in November 2003; Garza and Bernal did not allegedly breach the License until well after that time.

Amigo asserts that the district court erred in dismissing its tortious interference with contract claim against SBS for lack of sufficient evidence. To recover for tortious interference with contract, a plaintiff must prove: "(1) that a contract subject to interference exists; (2) that the alleged act of interference was willful and intentional; (3) that the willful and intentional act proximately caused damage; and (4) that actual damage or loss occurred." ACS Investors, Inc. v. McLaughlin, 943 S.W.2d 426, 430 (Tex. 1997).

On appeal, Amigo only complains that SBS tortiously interfered with the Employment Agreements to the extent that SBS's actions caused Garza and Bernal to resign prior to the expiration of the Initial Term. As explained below, Amigo produced sufficient evidence of its tortious interference claim.

1. Whether The Employment Agreements Were Subject To Interference

Because this tortious interference claim only complains about Garza and Bernal's untimely resignation, neither party disputes that the Employment Agreements were subject to inference until Garza and Bernal breached them by leaving Amigo. Amigo presented sufficient evidence that it knew of Garza and Bernal's intent to permanently cease performing the Show for Amigo and work for SBS on the morning of November 26, 2003. Thus, for the purpose of this appeal, the Employment Agreements were subject to interference until this time, and any acts taken by SBS after this time cannot be considered in evaluating Amigo's tortious interference claim.

2. Whether SBS Committed Willful And Intentional Acts Of Interference

To show tortious interference, a plaintiff is not required to prove intent to injure, but rather "only that the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it." Sw. Bell Tel. Co. v. John Carlo Tex., Inc., 843 S.W.2d 470, 472 (Tex. 1992) (internal quotations omitted). Moreover, the interfering party must have "actual knowledge of the contract or business relation in question, or knowledge

of facts and circumstances that would lead a reasonable person to believe in the existence of the contract or business relationship." Steinmetz & Assocs., Inc. v. Crow, 700 S.W.2d 276, 277-78 (Tex. App. 1985).

Amigo contends that it produced sufficient evidence that SBS "desired to cause Bernal and Garza to quit working for Amigo to work for SBS, and that this was substantially certain to happen given SBS's actions targeted at Bernal and Garza." Specifically, Amigo points to: (1) the Miami meeting between SBS, Hernandez, Garza, and Bernal and (2) SBS's communications and preparation of the SBS Employment Agreements after the Miami meeting.

### a. The Miami Meeting

First, Amigo produced sufficient evidence that Alarcon, SBS's President and Chairman of the Board, invited Hernandez, Garza, and Bernal to the Miami meeting for the purpose of discussing hiring Garza and Bernal to broadcast and syndicate the Show from Los Angeles for SBS. Specifically, Hernandez testified (by deposition summary): in late October/early November 2003, Alarcon contacted Hernandez in response to a proposal Hernandez had sent Alarcon earlier in the year regarding SBS becoming an affiliate of the Show, and Hernandez informed Alarcon that LEN was no longer syndicating the El Chulo Show; after this conversation, Alarcon contacted Hernandez a second time, and this time "Alarcon was looking for a new show in Los Angeles" and asked if Hernandez "could walk him [Alarcon] through the process" of how SBS could broadcast the El Chulo Show in Los Angeles at an SBS-owned station; Alarcon then invited Hernandez "to visit his offices in Miami, Florida, and he [Hernandez] was made aware that Joaquin Garza and Raul Bernal were going to be present in that meeting as well"; and that the purpose of the meeting was "that SBS was looking for a morning show for Los Angeles and they wanted to understand how that show would fit in with their current business plan." Furthermore, Garza testified that he received a call from Alarcon in November

2003, during which Alarcon "asked for us to go to his office in [Miami], to go to speak with him about the possibility of going back to Los Angeles." Finally, Brooks testified that when he confronted Garza about the Miami meeting shortly after it occurred, Garza told him that "they had a meeting with Raul Alarcon, and they [Garza and Bernal] were being offered a job [by SBS]." (emphasis added).

Second, Amigo offered sufficient evidence that SBS paid—at the very least—for the expenses Garza incurred for food and hotel in attending the Miami meeting. Garza testified that "SBS paid for my hotel, for my food."

Finally, Amigo offered sufficient evidence that—at the time of the Miami meeting—SBS knew, or should have known, that Garza and Bernal were under contract with Amigo. Hernandez testified that during his first phone conversation with Alarcon in late October/early November 2003, he informed Alarcon that Garza and Bernal were working for Amigo. Furthermore, Anderson testified that it was common in the radio industry for on-air talent to have employment contracts that bound the talent to a term of years. Even Cueva, SBS's in-house counsel, testified that radio stations have similar needs in preventing on-air talent from leaving and competing with their former employers. Viewed in the light most favorable to Amigo, SBS had actual knowledge of a business relationship between Garza, Bernal, and Amigo, and, because binding employment contracts were common in the radio industry for on-air talent, SBS had "knowledge of facts and circumstances that would lead a reasonable person to believe" in the existence of a contract between Garza, Bernal, and Amigo. Crow, 700 S.W.2d at 277-78; see also Top Value Enter., Inc., v. Carlson Mktg. Group, Inc., 703 S.W.2d 806, 810 (Tex. App. 1986) (defendant knew or should have known of the existence of a contract because it was common knowledge in the industry that grocers operated under written license agreements).

Given this evidence, a reasonable jury could conclude that SBS knew of Garza's and Bernal's Employment Agreements with Amigo and nonetheless set up the Miami meeting for the purpose of attracting Garza and Bernal to perform the El Chulo Show for SBS. Thus, Amigo presented sufficient evidence that SBS's actions regarding the Miami meeting constituted willful and intentional acts of interference.[22]

b. SBS's Actions After the Miami Meeting

Amigo presented sufficient evidence that, after the Miami meeting, SBS had actual knowledge of Garza's and Bernal's Employment Agreements with Amigo and nonetheless continued to communicate with and negotiate to employ Garza and Bernal while they were still employed at Amigo.

When Brooks learned about the Miami meeting, he asked Anderson to send SBS a letter asking SBS not to interfere with Garza's and Bernal's Employment Agreements with Amigo, which Anderson did on November 12. Thus, after November 12, it is undisputed that SBS definitively knew about Garza's and Bernal's Employment Agreements with Amigo.

Given SBS's knowledge, Amigo presented sufficient evidence that on November 18, SBS began to draft employment agreements for Garza and Bernal. Plaintiff's Exhibit 25 shows a string of e-mails between Hernandez, Cueva, and Alarcon's secretary, Ivette Davidson,[23] which indicate that: Hernandez and SBS were in the process of preparing the SBS Employment Agreements for Garza and Bernal to work at SBS, and SBS requested Garza's and Bernal's

---

[22] SBS asserts that their actions regarding the Miami meeting could not constitute intentional acts of interference because Hernandez was the driving force behind the Miami meeting, the Miami meeting was only very preliminary, and SBS did not know that Garza and Bernal were working for Amigo at the time of the Miami meeting. SBS's assertions, however, are based almost exclusively on the contradicted testimony of Alarcon, which this Court must disregard in reviewing the sufficiency of Amigo's evidence. See Reeves, 530 U.S. at 151.

[23] Amigo introduced sufficient evidence that Hernandez represented–and SBS understood–that Hernandez had full authority to act on behalf of Garza and Bernal.

Employment Agreements with Amigo to "help the lawyer who is doing the new contracts." Cueva testified that he requested to see Garza's and Bernal's Employment Agreements with Amigo in order to determine if they existed and if they prevented SBS from employing Garza and Bernal. Upon receiving the agreements, Cueva evaluated them and, with the help of SBS's outside counsel determined that they did not prevent SBS from hiring Garza and Bernal.[24]

Amigo then presented sufficient evidence that before Garza and Bernal left Amigo, SBS transmitted the SBS Employment Agreements to Hernandez, thereafter revised them in response to Hernandez's and Bernal's requests, and these agreements were significantly more lucrative than Garza's and Bernal's current Employment Agreements with Amigo. Cueva testified, and the evidence establishes, that on November 24–the day before Garza and Bernal stopped performing the Show–Cueva transmitted what appeared to be final drafts of the SBS Employment Agreements to Hernandez.[25] Furthermore, Cueva testified, and the evidence establishes, that on November 25, SBS revised the SBS Employment Agreements to accommodate for changes that were discussed

---

[24] SBS contends that its conclusion that Garza's and Bernal's Employment Agreements with Amigo permitted them to resign without breach establishes that SBS did not have the required intent to interfere with the Employment Agreements. SBS's assertion regarding its conclusion was made by Cueva, however, and the jury would have been free to disbelieve and disregard this testimony, especially given that: (1) SBS's interpretation of the Employment Agreements was unreasonable; (2) Amigo's November 12 letter to SBS informed SBS that Garza and Bernal had long-term employment agreements with Amigo; and (3) Anderson testified that it was common in the industry to bind on-air talent to a term of years. Thus, we may not consider SBS's supposed legal conclusion in reviewing the sufficiency of Amigo's evidence. Furthermore, even if SBS did have a good faith belief that Garza and Bernal could resign from Amigo without breach, this does not absolve SBS of tortious interference liability. See Sterner v. Marathon Oil Co., 767 S.W.2d 686, 689 (Tex. 1989) ("We . . . hold that the terminable-at-will status of a contract is no defense to an action for tortious interference with its performance.").

[25] The employment agreement for Garza was entitled "joacquin garza final.doc," and Cueva testified that the agreements he transmitted were called final drafts. Garza and Bernal, however, did not actually sign employment agreements with SBS until December 19, 2003.

26

between Hernandez and Bernal. Finally, Cueva testified that the drafts of the SBS Employment Agreements offered Garza and Bernal $300,000 and $100,000 per year, respectively, for a term of five years, amongst other bonuses. These terms were significantly more attractive to Garza and Bernal than their current agreements with Amigo.

Given this evidence, a reasonable jury could conclude that although SBS definitively knew that Garza and Bernal were under contract with Amigo, SBS continued to communicate with and negotiate with them–through Hernandez–in an attempt to lure them away from Amigo. Thus, despite the fact that Garza and Bernal did not sign any employment agreements with SBS until after they left Amigo, Amigo presented sufficient evidence that SBS's actions after the Miami meeting constituted willful and intentional acts of interference.[26]

### 3. Whether SBS's Intentional Acts Were The Proximate Cause Of Amigo's Damages

To establish proximate cause, a party must show that "the defendant took an active part in persuading a party to a contract to breach it." Davis v. HydPro, Inc., 839 S.W.2d 137, 139 (Tex. App. 1992) (emphasis omitted). "Merely entering

---

[26] SBS maintains that their actions throughout were merely responses to the requests and initiatives of Hernandez, and this fact precludes tortious interference liability. See Custom Drapery Co. v. Hardwick, 531 S.W.2d 160, 166 (Tex. Civ. App. 1975) ("[N]o wrong is committed where the employee acts upon his own initiative and the new employer is merely receptive to the employee's suggestions."). However, SBS's claim that Hernandez initiated all communication and action relies on the contradicted testimony of Alarcon and Cueva, which must be disregarded in reviewing the sufficiency of the evidence. Furthermore, as described in this section, Amigo presented sufficient evidence for a reasonable jury to believe that SBS was not "merely receptive" to Hernandez's actions, but rather actively pursued and induced Garza and Bernal to work at SBS. The fact that Hernandez originally approached SBS with a proposal to broadcast the Show from Los Angeles in May 2003 does not render SBS's alleged subsequent pursuit of Garza and Bernal "merely receptive" action–a company is only "merely receptive" to an employee's suggestions where the employee resigns for his own personal reasons independent of any act or inducement on the part of the new employer. See Bray v. Squires, 702 S.W.2d 266, 271 (Tex. App. 1985). Viewing the evidence in the light most favorable to Amigo, a reasonable jury could believe that Garza and Bernal would not have left Amigo but for the inducements of SBS.

into a contract with a party with the knowledge of that party's contractual obligations to someone else is not the same as inducing a breach." Id.

Amigo presented sufficient evidence that SBS committed numerous acts of interference for the purpose of employing Garza and Bernal, as discussed in Section III.B.2 supra, and these acts were successful in persuading Garza and Bernal to leave Amigo. First, SBS knew the terms of Garza's and Bernal's contracts with Amigo and offered them higher salaries and bonuses. Second, Garza and Bernal knew of the SBS Employment Agreements and their terms before they left Amigo. Specifically, SBS transmitted final drafts of employment agreements to Hernandez on November 24, 2003, the day before Garza and Bernal stopped performing the Show, and revised those agreements on November 25, the day before Garza and Bernal definitively informed Amigo that it would no longer be performing the Show. Finally, Garza's and Bernal's statements to Amigo indicated that their decision to leave Amigo was directly due to SBS's offer of employment. Brooks testified that on November 26, Bernal informed him that he and Garza had accepted positions with SBS in Los Angeles, and Garza thereafter told him via phone that he did not need Amigo any more. Thus, Amigo produced sufficient evidence of proximate causation. See Top Value Enters., Inc., 703 S.W.2d at 811 (finding sufficient evidence of proximate causation where the defendant made an active presentation and topped the terms of plaintiff's previous contracts, resulting in a successful offer).

4. Whether Amigo Suffered Actual Damages

As discussed in Section III.A.1.b supra, Amigo produced sufficient evidence of the fact and amount of damages that resulted from the loss of the Show—that is, Amigo produced sufficient evidence of its lost profits and lost investment. Thus, Amigo can pursue these two alternate theories of damages on remand. Furthermore, Amigo produced sufficient evidence—in the form of a profit and loss statement prepared by SBS—that SBS made $394,407.15 in profit from airing the

El Chulo Show on SBS. In the event the jury cannot readily ascertain the amount of lost profit Amigo sustained from the loss of the Show, Amigo can seek to recover the amount SBS was unjustly enriched by its actions. See Sandare Chem. Co., 820 S.W.2d at 24 ("[I]n a case of tortious interference with contractual relations, evidence of the defendant's profits may, when the plaintiff cannot show with certainty the profits it would have realized in the absence of the interference, constitute evidence of the plaintiff's lost profits.").

Thus, with respect to Amigo's claim for tortious interference with contract, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

## C. Amigo's Lanham Act And Misappropriation/Unfair Competition Claims

Amigo contends that the district court erroneously concluded that it withdrew its Lanham Act and misappropriation/unfair competition claims during the hearing on Appellees' motions for judgment as a matter of law. After reviewing the hearing transcript, we conclude that Amigo did not withdraw these claims.[27]

---

[27] The trial transcript provides:

THE COURT: And how about the LANAMAC? The violation of the LANAMAC?

MR. TIBBALS [Counsel for Amigo]: The LANAMAC, Your Honor, and unfair competition or the so called free ride, we don't believe are nearly as narrow as described by counsel.
    The LANAMAC includes the protection of names such as El Chulo Y La Bola. If there is a finding by—

THE COURT: That may be the case if have you a right—legal right to it in the first place, but there is no other evidence in this case shows that you had it.

MR. TIBBALS: If the contract is ambiguous and the jury finds that the intent of the parties—

THE COURT: I've already ruled the contract is not ambiguous, have I not, as a matter of law?

29

SBS asserts that any alleged error was harmless because the district court "ruled against Amigo on those claims when it concluded that the Agreements did not give Amigo a legal right to use the names 'El Chulo y La Bola.'" However, as discussed in Section III.A.2.a supra, the district court erred in finding as a matter of law that Amigo did not have a license to use the names "El Chulo" and "La Bola."

Thus, with respect to Amigo's Lanham Act and misappropriation/unfair competition claims, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED in part, and REVERSED and REMANDED in part.

---

MR. TIBBALS: I inferred that, Your Honor, from some of the objections, but I really did not know. . . .

THE COURT: Okay. Is there any LANAMAC evidence in this case?
. . . .

MR. TIBBALS: The LANAMAC arises from the validity or in—arises from the validity of our license to use the name.

THE COURT: All right. And tell me about the tortuous interference with the contract.