**TOP VALUE ENTERPRISES, INC., Appellant,**

v.

**CARLSON MARKETING GROUP, INC., Appellee.**

No. 08–82–00357–CV.

Court of Appeals of Texas, El Paso.

Jan. 29, 1986.

Rehearing Denied Feb. 26, 1986.

Malcolm Harris, Timothy V. Coffey, Grambling & Mounce, El Paso, for appellant.

Pat Maloney, Law Offices of Pat Maloney, San Antonio, C.R. Kit Bramblett, Bramblett & Bramblett, P.C., El Paso, for appellee.

Before STEPHEN F. PRESLAR, C.J., and WARD and OSBORN, JJ.

## OPINION

WARD, Justice.

Gold Bond Stamp Company, a division of Carlson Marketing Group, Inc., sued Top Value Enterprises, Inc. on a theory of tortious interference with contract alleging that Gold Bond had exclusive trading

stamp license agreements with a Big 8 group of independently owned grocery stores in the El Paso area. Based upon a jury verdict favorable to the plaintiff, the trial court entered judgment for the plaintiff for actual and exemplary damages totaling $733,350.00. The defendant Top Value appeals, and as modified we affirm.

Most of the essential facts in the case are undisputed. In 1976, Gold Bond acquired a stamp company which had been owned by the Big 8 group of stores and which was servicing those stores. Written trading stamp contracts were then obtained by Gold Bond from each of the seven individual grocery store owners who operated as the Big 8 and whose contracts are involved in this dispute. Each of these were form contracts, being practically identical but differing as to volume of sales contemplated, dates of execution and time of cancellation. Four of the contracts provided that they would be in force for twelve months and would be considered renewed for successive twelve-month periods. Provisions required termination at the end of each contract year provided notice was given at least sixty days prior to the expiration of any contract year. The other three contracts differed in that their initial contract period was for five years and the renewal period was for one year with sixty-day or forty-five-day notice provisions prior to expiration date to be able to terminate.

In the summer of 1981, friction between Gold Bond and the Big 8 stores developed out of a double stamp program used by the store owners in June of that year. The store owners were informed by Gold Bond that they were over their alloted advertising budget for the year and the owners became dissatisfied with their contracts. The defendant Top Value learned of this and contacted the store owners regarding its own program. Top Value had, about the same time, hired from Gold Bond one Don Cooley who was familiar with all of the terms of the Gold Bond contracts. On July 6, the defendant's representative met with the Big 8 store owners and on July 13, at a second meeting, an offer was made by Top Value to the stores regarding its own program, the offer including three times the amount of advertising budget that Gold Bond was then paying.

Gold Bond, knowing of the friction, met with the group of Big 8 owners on July 15 and offered to raise its advertising budget as an amendment to each of its contracts. According to the plaintiff's testimony, the group of store owners was then satisfied and letter agreements authorizing the changes were submitted to each store owner on July 16 by Orville Hammer, Gold Bond's sales manager. At the same time, letters and telegrams were sent to the defendant's top executives notifying them that the plaintiff was aware that the defendant's representatives were soliciting trading stamp license agreements with each of the Big 8 stores and that Gold Bond had at that time existing trading stamp license agreements with each of the stores and that any interference with the continual performance of the contracts would not be tolerated. After this notification, the defendant's general counsel informed the plaintiff that they would continue to interfere and a new offer was then made by the defendant's representatives to the Big 8 store owners which doubled their original offer and which persuaded the Big 8 grocers to cancel their existing contracts with Gold Bond.

Following this determination, Bobby Edmond, the vice president of the Big 8 group, on August 18, notified the defendant that effective September 30, 1981, the Big 8 stores' contracts with Gold Bond would be cancelled, noting that the last day for Gold Bond stamps would be on September 26 and that a new program would be effective as of September 27. New contracts between the store owners and Top Value were then signed on September 27, 1981, and on September 28, the plaintiff filed the present law suit.

According to the defendant's version of the events, the individual store owners became dissatisfied with Gold Bond and with its advertising budget and some of the Big 8 store owners were determined on their

own to terminate their Gold Bond contracts and did so only after consultation with their attorneys; that Top Value representatives were never told of any of the terms of the Gold Bond contracts and had no way of knowing the provisions of the contracts; that the Top Value offer was substantially better than the Gold Bond contract; and no one ever informed the Top Value people as to what offer they would have to make.

As previously indicated, trial was to a jury which by its answers to special issues made the following findings: (1) that Top Value knew or in the exercise of ordinary care should have known of the existence of the license agreement between the Gold Bond and the Big 8 stores; (2) that Top Value interfered with the license agreement between Gold Bond and the Big 8 stores; (3) that the interference of Top Value with the contract between Gold Bond and Big 8 stores was intentional and willful; (4) that the interference of Top Value with the contract between Gold Bond and Big 8 stores was the proximate cause of a money loss to Gold Bond; (5) that the sum of $483,350.00 would reasonably compensate Gold Bond for its money loss caused by the interference of Top Value for loss of income past and future and "all other related damages suffered because of the interference if any by Top Value;" (6) that Top Value acted with actual malice in its interference with Gold Bond's license agreement; and (7) that the sum of $250,000.00 could be recovered by Gold Bond against Top Value as exemplary damages. The defendant's motion for judgment non obstante veredicto was filed and overruled, and based upon the verdict of the jury, judgment was entered that the plaintiff recover the total sum of $733,350.00 damages from the defendant.

The Appellant first presents a series of four no evidence points, three of them being that no evidence was presented that the Appellant engaged in any wrongful, illegal or improper conduct or exceeded that which was in the exercise of its lawful rights. The Appellant argues the general principal that an essential element in a right of recovery for contractual interference is that the interference must be without right or justification and interference with contractual relations is privileged where caused by the exercise of a party's own rights or where the party possesses an equal or superior interest than that of the plaintiff in the subject matter. *Black Lake Pipe Line Company v. Union Construction Company, Inc.*, 538 S.W.2d 80 (Tex. 1976). *See: White v. Larson*, 586 S.W.2d 212 (Tex.Civ.App.—El Paso 1979, no writ); *Tidal Western Oil Corporation v. Shackelford*, 297 S.W. 279 (Tex.Civ.App.—Fort Worth 1927, ref'd).

Specifically, it is the Appellant's argument that in the field of business competition one may persuade customers to change their business relations without incurring liability although it is known that a broken contract will result. Authority to that effect exists. *Fairbanks, Morse & Co. v. Texas Electric Service Co.*, 63 F.2d 702 (5th Cir.1933); *Citizens' Light Heat & Power Co. v. Montgomery Light & Water Power Co.*, 171 F. 553 (C.C.Ala., N.D.1909); *Testing Systems, Inc. v. Magnaflux Corporation*, 251 F.Supp. 286, 288 (E.D.Pa. 1966).

In this area, there is authority to the contrary that competition alone does not justify inducing a breach of contract. In line with the latter view, it has been held that the right of competition does not justify a person to knowingly and deliberately, for his own benefit or advantage, induce the breach of a contract by offering lower prices. 45 Am.Jur.2d, Interference, sec. 32, 309. This is the position adopted by the Restatement of the Law 2d, Torts sec. 768 (1979). The Restatement differentiates between (1) intentionally causing a third party not to enter into a prospective contractual relationship with another who is his competitor or not to continue an existing contract terminable at will and (2) intentionally causing the breach of contracts that are not terminable at will. Section 768, paragraph (2), is as follows: "The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with

the other from being an improper interference if the contract is not terminable at will."

Under this view, the interference with an existing contract of another is deemed improper if it is made to entice away customers who are bound to a plaintiff by contract or to pursue any competitive scheme that would enhance the defendant's opportunities at the expense of actual existing contract rights in the plaintiff in the absence of some justification other than competition for future business. Prosser and Keaton on Torts, 5th Ed., 987 (1984). This is stated to be the majority rule. *Downey v. United Weatherproofing*, 363 Mo. 852, 253 S.W.2d 976 (1953). The following is from this authority at 981:

> As stated, the right of a party to a contract to reap the profits resulting from the performance and the right to performance by the other party have been expressly declared to be property rights entitling each party to the other's performance, and, while the right of free competition in business is recognized as the right of every citizen, the right to the performance of an existing contract is a right to rely upon another's present commitment and consequently one of greater expectancy than is the right to enter into future contracts even in a competitive field. So the right of free competition alone, as stated, should be considered of less import and should be less highly protected in law than the right under a contract already entered into.

We adopt that view.

■ The plaintiff's evidence in this case goes beyond a showing of mere solicitation. Here, the first offer made by the defendant to the group of grocers was three times better in advertising allowance than that with Gold Bond. The Gold Bond representative then satisfied the grocers on July 15 by upping its own budget and sent the notices to Top Value informing them that Gold Bond had contracts with the Big 8 grocers. At that point, the chief counsel for Top Value informed Gold Bond that Top Value would continue their efforts to obtain the Big 8 business. Subsequently, Top Value doubled its original offer on advertising to the Big 8 grocers and did obtain that business.

Under the four no evidence points, the argument is made that there was no evidence in the case that Top Value knew the terms of any of the Gold Bond contracts. Considering only the evidence and the inferences arising therefrom, the argument and the point relating thereto will be overruled. Hammer testified that Dan Cooley, the ex-employee of Gold Bond was hired by Top Value about the time the original dispute with the grocers arose and that he knew all of the terms and conditions of those contracts. Further, it was common knowledge in the industry that all grocers operated under written license agreements. The usual terms of those contracts were well known. It is clear that Top Value knew or acting reasonably should have known of the existence of the contracts and of their terms. That is all that is required. *Armendariz v. Mora*, 553 S.W.2d 400 (Tex. Civ.App.—El Paso 1977, writ ref'd n.r.e.); *Tippett v. Hart*, 497 S.W.2d 606 (Tex.Civ. App.—Amarillo 1973), *writ ref'd n.r.e.*, 501 S.W.2d 874 (Tex.1973); *Kelly v. Galveston County*, 520 S.W.2d 507 (Tex.Civ.App.— Houston [14th Dist.] 1975, no writ); Prosser and Keaton on Torts, 5th Ed., 982 (1984). The argument is overruled.

■ The third point is that the court erroneously entered a judgment as the evidence was conclusive that the Big 8 grocers cancelled their Gold Bond contracts for reasons of their own upon advice of their own counsel without active interference or participation by the defendant. Essentially, here, the argument is that there was no evidence regarding proximate cause because the contracts with Gold Bond were not exclusive and there was evidence that some of the Big 8 grocers were going to terminate their contracts with Gold Bond regardless of the intervention by Top Value. Again considering only the evidence and the inferences therefrom which support the finding of proximate cause, we note the following: the contracts were not

legally exclusive but from a practical standpoint, they were exclusive as it was economically unfeasible for the grocers to give out two types of stamps. Such is conceded in the brief by the Appellant. Additionally, the active presentation made by the Top Value people to the grocers, the topping of the previous Gold Bond contracts and the final successful offers justified the jury to render an affirmative answer to the proximate cause question. The evidence was legally sufficient. Points of Error Nos. One through Four are overruled.

■ The Appellant next presents a series of six points complaining of alleged errors regarding the evidence. First, Appellant points to error in the introduction of testimony by Mr. Hammer, who, upon direct examination to the question "[i]n the 40-some years that you [plaintiff] have been in the business, have you ever sued anyone?" answered, "[y]es, and we received an $8 million judgment" for contract infringement. Appellant failed to timely object to the answer when it was made but elected to wait until the next recess when it moved for mistrial. No motion to strike was ever made. Any objection was waived. *Battles v. Adams,* 415 S.W.2d 479, 483 (Tex.Civ.App.—Austin 1967, writ ref'd n.r. e.); *Hix v. Wirt,* 220 S.W.2d 530, 532 (Tex. Civ.App.—Waco 1949, writ ref'd n.r.e.). Further, the error was cured by counsel's later cross-examination. Top Value showed through its subsequent cross-examination of Mr. Hammer that he had inaccurately portrayed the prior suit. Point of Error No. Five is overruled.

■ By its next three points, the Appellant complains about testimony of John Heim, the Appellee's vice president and former general counsel. After being qualified as an expert in the field, he testified that his review of certain of the testimony left him with the conclusion that a law suit for interference with contract was justified. There was no objection to this testimony. Later, Heim was asked essentially the same question again and the Appellant at that time objected to the introduction of a legal conclusion. The objection was overruled. On cross, the Appellant fairly opened the door by asking Heim several questions concerning what acts would constitute interference and what acts would constitute mere solicitation. On re-direct, Heim gave his opinion that his company was entitled to punitive damages. Objection was made and overruled. After further objections, the court instructed the jury that the law in the case would come from the court. The charge to the jury also instructed the members to disregard testimony as to legal conclusions. The Appellant may not now complain about the introduction of the statement concerning the justification for the law suit since it failed to object the first time the witness gave his opinion. *Delhi Gas Pipeline Company v. Heddin,* 508 S.W.2d 417, 420 (Tex.Civ.App.—Tyler 1974, no writ). A trial court's admission of evidence over objection is deemed harmless if the objecting party permits similar evidence to be introduced without objection.

■ Appellant, by further cross-examining John Heim on the same line of testimony, waived any right to complain as to the admission of his opinion. Later, Appellant moved that the testimony of Heim be stricken and this motion was overruled. No error is reflected, as a motion to strike the evidence of a witness without specifying which particular testimony is too general. Overruling the motion was proper. *City of Kennedale v. City of Arlington,* 532 S.W.2d 668, 678 (Tex.Civ.App.—Fort Worth 1976, writ dism'd).

■ Finally, Appellant filed a motion for mistrial. Again, this was overruled. Such motion will not prevent a waiver of objection where objection to the testimony was not clear and timely. *Anderson v. McDonald,* 486 S.W.2d 123, 124 (Tex.Civ.App. —Austin 1972, no writ). Finally, we are of the opinion that the instruction and charge cured the error as to testimony on the punitive damages. Points of Error Nos. Six, Seven and Eight are overruled.

■ Appellant's Point of Error No. Nine complains of the introduction of testimony concerning the financial reserves of the Appellant. The witness Hammer qualified as an expert on finances of stamp companies and was allowed to give his opinion that Appellant had reserves in the area of several hundred million dollars. The Appellant did not object to the inadmissibility of the testimony as to "financial worth" but only objected that such testimony was incompetent and hearsay. This was not a proper objection and resulted in a waiver of the objection. *Metropolitan Life Insurance Company v. Duncan*, 566 S.W.2d 351, 352 (Tex.Civ.App.—Fort Worth 1978, no writ). Point of Error No. Nine is overruled.

Point Ten complains of the court admitting into evidence the two Las Cruces license agreements, as they were allegedly outside the scope of the pleadings in the case. The pleadings generally covered the Las Cruces contracts as well as those in El Paso County. Point of Error No. Ten is overruled.

■ The final group of points relates to alleged substantive errors contained in the court's charge and to the evidentiary support for the jury's answers to the special issues. Points of Error Eleven through Fifteen, inclusive, complain of the absence of a defensive issue or instruction regarding justification or privilege. The Appellant reiterates its position that it had a perfect right to make its presentation to the grocers, as it was exercising its right of free competition in business, and that the charge failed to present this position to the jury. We have previously held that the right of competition did not justify the Appellant, knowing of the presence of the existing term contracts, to willfully and intentionally cause the grocers to breach those contracts by offering better terms. The legal defense adopted by the Appellant in this case was that the grocers were justifiably dissatisfied with Gold Bond and for that reason they broke their contracts. This was the negative of causation and proximate cause was correctly defined in the charge and adequately submitted by Special Issue Four. Points of Error Nos. Eleven through Fifteen are overruled.

■ Points Sixteen through Eighteen inclusive complain of the repeated incorrect use by the court in Special Issues One through Four of the words "license agreement between Gold Bond and the Big '8' Stores" in the face of the evidence that no such contracts existed. Gold Bond had only license agreements with each individual store owner and each contract contained different advertising amounts, different expiration dates and different cancellation clauses. The use of the term was error. The question presented to us is to determine if the error of law amounted to such a denial of the rights of the Appellant as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case. Rule 434, Tex.R. Civ.P.

The undisputed testimony by all parties was that there were seven individual contracts with the grocery stores. The contracts were in evidence and their termination dates and manner of termination were clearly presented. Gold Bond's expert on damages testified that lost profits were determined by the number of stamp pads that were used by each store and which were sold to the individual stores by Gold Bond at a price of $10.00 each. His opinion on loss of future profits was figured for each store on two bases, one that the individual store owner would terminate its respective contract at the earliest possible date under the contract, and the other on the assumed basis that all seven stores would continue to operate under the Gold Bond franchise until the five-year contracts had expired according to their terms. The expert's explanation for his use of the latter basis was that the Big 8 operators combined for advertising and purchasing power and that as a practical matter they would all have continued under the Gold Bond franchise for that period but for the dissatisfaction created by the Appellant's actions which was the only cause of the breach of the contracts. Not only did all of

the evidence in the case point to the existence of the separate individual contracts, but closing argument by the attorneys clearly conceded the existence of the individual contracts and of the various amounts of damages arising from the loss of the individual accounts. The seven owners did act as a group in terminating the contracts by their notice dated August 18, 1981. Reviewing the above, we feel that the submission of the case under the assumption that only one license agreement existed did not confuse or mislead the jury. The error was harmless and Points of Error Nos. Sixteen through Eighteen are overruled.

Points Nineteen through Twenty-two essentially complain of the submission of Special Issue One, as there was no evidence that any Appellant's representative had knowledge of any of the terms of the Gold Bond contracts and submitting whether the Appellant "knew or ... should have known of the existence of the [contract]" was error as it injected a negligence inquiry into an intentional tort case. For reasons previously expressed under the first group of points, the argument insofar as it relates to "no evidence" is rejected. Further, the rule is that the interfering party must have had actual knowledge of the existence of the contract or at least knowledge of such facts and circumstances that would lead a reasonable person to believe in their existence. *Armendariz v. Mora, supra,* at 406. Points of Error Nos. Nineteen through Twenty-two are overruled.

■ Point of Error No. Twenty-three complains of the form of submission of question number 5, the damage issue, and, in particular, to subsection c thereof where it allowed the jury to consider "all other related damages suffered," as it opened the door to guess and speculation as to the damages which the jury was free to award. This was an erroneous submission. The Appellee's expert damage witness testified only to loss of profits, to expenses in closing the gift centers, to advertising money which was lost, to unamortized expenses in opening the two Las Cruces stores, and to

necessary advertising expenses incurred in advising the public that Gold Bond was not going out of business. All of these were in his opinion a direct result of the breach of the contracts. Considering all phases of the trial, we are of the opinion that the error was harmless and that the jury was not misled as to damages that were in issue. Point of Error No. Twenty-three is overruled.

■ Points of Error Nos. Twenty-five and Twenty-six complain of the submission of the instructions and special issues on malice and punitive damages, as there was no evidence of any malice or malicious conduct that would warrant the award of punitive damages in the case.

Under this point, we consider only the evidence and inferences which support the finding of conduct warranting exemplary damages. In this area, a distinction is made between actual and implied malice. *Courtesy Pontiac, Inc. v. Ragsdale,* 532 S.W.2d 118 (Tex.Civ.App.—Tyler 1975, writ ref'd n.r.e.). Implied or legal malice exists when wrongful conduct is intentional and without just cause or excuse. That is a necessary element to the action of interference with contract and to the recovery of actual damages. On the other hand, to award exemplary damages actual malice must exist. This rule was noted in *Clements v. Withers,* 437 S.W.2d 818 (Tex.1969), where it stated that actual malice was not necessary to sustain an award to recover compensatory damages, but was necessary to sustain an award of exemplary damages. The court defined actual malice as "ill-will, spite, evil motive, or purposing the injuring of another." It further noted two exceptions to the rule requiring actual malice in order to award exemplary damages, this being where the defendant's acts are accompanied by fraud or other aggravating circumstances. The basis for this decision was noted in *Armendariz v. Mora, supra.* In that case, we held there was more than the intent to cause a breach of the plaintiff's contract as there was present evil motives on the part of the defendant. We stressed the presence of spite and revenge

as well as the complicated and concealed plan to bring about the contractual breach. In the present case, we have found that we have no more than an intent on the part of the Appellant to obtain its own contracts knowing of the existence and the terms of Gold Bond's contracts and knowing to obtain its own contracts the Appellant would cause a breach of the Gold Bond contracts. Under the present rule in this state, that is not enough. Points of Error Nos. Twenty-five and Twenty-six are sustained.

We have considered all of the Appellant's points and they are overruled with the exception of Points of Error Nos. Twenty-five and Twenty-six which we have sustained. We hold that the judgment of the trial court which awarded the sum of $250,-000.00 exemplary damages is reversed and that the Appellee take nothing as to this. In all other respects, the judgment of the trial court is affirmed.