# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 28, 2013

No. 11-20371

Lyle W. Cayce
Clerk

DAVID HOMOKI, doing business as Global Check Services,

Plaintiff - Appellee Cross-Appellant

v.

CONVERSION SERVICES, INCORPORATED,

Defendant - Appellee

ELECTRONIC PAYMENT SYSTEMS, L.L.C.,

Defendant - Appellant Cross-Appellee

Appeals from the United States District Court
for the Southern District of Texas

Before KING and HIGGINSON, Circuit Judges, and FOOTE, District Judge.[*]
FOOTE, District Judge:

David Homoki d/b/a Global Check Services ("GCS") and Electronic Payments Systems ("EPS") both sell check and debit/credit processing services to merchants. When Conversion Services, Inc. ("CSI"), a sales agent for GCS, stopped selling GCS's products and started selling for EPS, GCS brought suit against EPS and CSI alleging that EPS tortiously interfered with GCS's contract with EPS and conspired to breach CSI's fiduciary duty to

---

[*] District Judge of the Western District of Louisiana, sitting by designation.

No. 11-20371

GCS. After a jury trial and special verdict, the district court entered judgment in the amount of $700,000 against EPS and $2.15 million against CSI.  On appeal, EPS challenges the sufficiency of the evidence supporting the jury's finding on the interference with contract claim and the trial court's decision to allow the conspiracy to breach fiduciary duty claim to go to the jury. GCS cross-appealed, asserting that the trial court erred in refusing to enter judgment holding EPS jointly and severally liable for the damages caused by CSI's breach of fiduciary duty. We affirm the rulings of the district court.

## I.    Factual and Procedural Background

This suit involves EPS's attempt to develop a competing version of a GCS product. GCS has sold check and debit/credit processing services to merchants since 1994. EPS sells similar services to merchants. Their dispute centers on GCS's "Accounts Receivable Conversion" ("ARC") service. David Homoki, the founder of GCS, developed the idea for ARC in 2003 and 2004 and began marketing it in 2005.  The ARC service allows customers to pay merchants for big ticket items with a series of post-dated checks that, in certain circumstances, will be guaranteed by GCS. Around 2006, EPS became interested in developing a similar product.

In order to use the ARC service, the customer and merchant must be qualified by GCS. GCS decides whether to qualify a customer based on a wide range of factors, including the price of the item to be purchased, the customer's monthly income, the age of the customer's checking account, the customer's check writing history, and the merchant's history. The customer writes a check for the amount of down-payment on the item. The down-

No. 11-20371

payment check is made payable on the day of the transaction. The customer also writes a number of post-dated checks that add up to the balance of the purchase price of the item. Typically, the item must be completely paid for within ninety days. The checks are run through a device that communicates to the merchant whether the checks will be guaranteed by GCS. If the checks are guaranteed, the merchant will receive the entire purchase price of the item directly from GCS within twenty-four to seventy-two hours.

GCS does not sell their products to merchants directly, rather they use agents who market their product. Conversion Services, Inc. ("CSI") was GCS's largest agent. Larry Stuart ran CSI. GCS contended at trial that in 2005 CSI signed a contract with GCS in which CSI agreed to sell GCS's services. The 2005 contract did not require CSI to refrain from selling competitors' products. Because GCS could not produce a copy of the signed 2005 contract, the existence of the contract was disputed. Mr. Homoki testified that in 2008 CSI signed another contract that was substantially similar to the 2005 contract in all respects except that it included an exclusivity provision prohibiting CSI from selling competing products. A signed copy of the 2008 contract was not produced by GCS at trial. Whether CSI ever signed the 2008 contract and whether Mr. Stuart was aware of the exclusivity provision in the contract were contested issues at trial.

The relationship between GCS and CSI was initially profitable for both parties, but it soured quickly. CSI signed up a total of 1,257 merchants to the ARC service—many more than any of GCS's other agents. During 2007 and 2008, however, Mr. Homoki discovered that CSI had been misrepresenting the terms of the ARC service to merchants, over-charging for leased

3

No. 11-20371

equipment, charging merchants for fees that did not actually exist, and failing to provide on-going support. When Mr. Homoki discovered these problems, he and his employees called 800 of the 1,257 merchants signed up by CSI. Each merchant contacted complained about CSI's misrepresentations, overcharging, and lack of support. Only 52 of the 1,257 merchants signed up by CSI ultimately continued to use the ARC service. GCS ceased working with CSI on July 23, 2009.

Around this time Mr. Homoki also learned that Mr. Stuart was selling the EPS90 service. Since 2006, EPS had been developing EPS90, a service similar to ARC.  Mr. Stuart testified that he had been in contact with EPS at least since 2006, when EPS informed him that they were interested in developing a program similar to ARC. EPS knew that CSI worked as a selling agent for GCS and sought to profit from Mr. Stuart's knowledge of how the ARC program was sold. Mr. Stuart testified that in October 2008, as EPS was preparing to bring the EPS90 service to market, he discussed with EPS employees how the service should function and how it should be marketed. Both parties anticipated that Mr. Stuart would work as an agent selling the EPS90 service. Mr. Stuart obtained his first EPS90 contract in November 2008.  He testified that in total he moved eight merchants from the ARC program to EPS90. In January 2009, he stopped selling for GCS. CSI was not the only GCS agent that EPS attempted to recruit. Another agent of GCS, Ms. Beranek, testified that EPS tried to persuade her to sell for EPS and to move merchants from GCS to EPS. There was also testimony that someone using CSI's password accessed confidential portions of GCS's computer system from computers owned by EPS and obtained confidential information

4

No. 11-20371

related to GCS's merchants.

GCS filed suit against CSI asserting breach of contract, breach of fiduciary duty, fraud, negligent misrepresentation, tortious interference with plaintiff's existing contracts, tortious interference with plaintiff's prospective business, injury to business reputation, computer fraud and abuse, and civil conspiracy claims. GCS pled five claims against EPS: tortious interference with contracts between GCS and GCS's agents; tortious inference with contracts between GCS and merchants; civil conspiracy; business disparagement; and computer fraud and abuse. Only the following two claims against EPS were submitted to the jury:

1)   interference with the CSI/GCS contract;

2)   civil conspiracy to breach CSI's fiduciary duty;

The jury returned the following verdict:

1)   CSI breached its contract with GCS, causing GCS to suffer $1.15 million in past lost profits and $1 million in future lost profits;

2)   CSI's relationship with GCS was an agent/principal relationship, and CSI breached its fiduciary duty to GCS, resulting in $1.15 million in past lost profits and $1 million in future lost profits;

3)   EPS conspired with CSI to breach CSI's fiduciary duty to GCS, proximately causing damage to GCS. The jury was not asked to find, and did not find, the amount of damages caused by the conspiracy;

4)   CSI committed fraud against GCS, causing damages in the amount of $1.15 million in past lost profits and $1 million in future lost profits; and

No. 11-20371

5)    EPS intentionally interfered with GCS's existing contract with CSI, causing GCS to suffer $200,000 in past lost profits and $500,000 in future lost profits.

The district court entered judgment in the amount of $2.15 million against CSI and $700,000 against EPS. GCS and EPS lodged timely appeals. CSI has not appealed and has not filed any briefs in this Court.

## II.    Subject Matter Jurisdiction

While this appeal was pending, the parties attempted to mediate their dispute. After the mediation, two handwritten documents were drafted and numerous emails were exchanged regarding the terms of potential settlement. The parties disputed whether they entered into a valid settlement agreement. EPS moved to stay this appeal pending the outcome of a separate suit to enforce the purported settlement agreement. Recognizing our obligation to ensure that a case or controversy remains in this appeal, in a separate opinion we denied the motion to stay, enjoined the parties from prosecuting the separate suit, and remanded to the district court for the limited purpose of determining whether a valid settlement existed. *Homoki v. Conversion Serv., Inc.,* No. 11-20371, 488 F.App'x 848 (5th Cir. 2012) (per curiam) (unpublished). On remand, the district court found that GCS and EPS had not entered into a binding settlement. Neither party appealed the district court's ruling. A live controversy therefore exists, and we have subject matter jurisdiction.

## III.    Sufficiency of the Evidence

EPS argues that the evidence presented at trial was insufficient to support the jury's findings that EPS interfered with the CSI/GCS contract

and that this interference caused $700,000 in lost profits. EPS raised these issues in motions for judgment as a matter of law at the close of GCS's case in chief, at the close of evidence, and after entry of judgment. We review a decision not to grant judgment as a matter of law *de novo. MGE UPS Sys., Inc. v. GE Consumer and Indus., Inc.*, 622 F.3d 361, 365 (5th Cir. 2010). A rule 50(a) motion for judgment as a matter of law is properly granted if the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable jurors could not have arrived at a contrary verdict. *Poliner v. Texas Health Sys.*, 537 F.3d 368, 376 (5th Cir. 2008). We review all the evidence in the record in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party; we do not make credibility determinations or weigh the evidence. *Id.*

### A.    Interference with Contract

We turn first to EPS's contention that there is insufficient evidence to support the jury's finding that EPS had knowledge of the exclusivity clause in the CSI/GCS contract.

### 1.    Applicable Law

We apply Texas substantive law, as this case falls under our diversity jurisdiction. *Downhole Navigator, L.L.C. v. Nautilus Ins. Co.*, 686 F.3d 325, 328 (5th Cir. 2012). Texas law requires a party asserting a claim for interference with a contractual relationship to prove: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) that the interference was a proximate cause of the plaintiff's damages; and (4) actual damage or loss. *Powell Indus., Inc. v. Allen*, 985

S.W.2d 455, 456 (Tex. 1998). Interference with a contract is tortious only if it is intentional. *Southwestern Bell Tel. Co. v. John Carlo Texas, Inc.*, 843 S.W.2d 470, 472 (Tex. 1992).

Both parties assume that in order to intentionally interfere with the CSI/GCS contract, EPS must have had knowledge, or reasonably should have had knowledge, of the exclusivity provision of the contract. Absent the exclusivity clause, CSI's decision to cease selling for GCS and to begin selling for EPS would not have breached GCS's contract. By recruiting CSI, then, EPS would be persuading CSI to take an action that would not have breached the contract. There would thus be no intent to interfere with the contract. *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997) ("Ordinarily, merely inducing a contract obligor to do what it has a right to do is not actionable as tortious interference with a contract."). On the other hand, the Texas Supreme Court has held that the fact that a party had the right to terminate an "at will" contract at any time is not a valid defense to an action for tortious interference with that contract. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 689 (Tex. 1989). We offer no opinion on whether EPS's actions would constitute interference even in the absence of an exclusivity clause under *Sterner*, a question that involves a matter of state law that was not addressed by either party, because both parties frame the sufficiency issue as whether knowledge of the exclusivity clause was proved.  We will thus proceed on the assumption that when a party to a contract would be free to take the action the alleged tortfeasor undertook but for a specific provision of that contract, the intent element turns on whether the alleged torfeasor

No. 11-20371

had or should have had knowledge of that provision.[1] The question is thus whether sufficient evidence was presented that EPS either knew or reasonably should have known that the GCS/CSI contract prevented CSI from selling for anyone else.

### 2. Analysis

The exclusivity provision of the written, unsigned contract submitted into evidence by GCS reads as follows:

> While under contract with GCS iso [CSI] is prohibited from selling, marketing, or in any way representing any service from any other company in competition with any service offered by GCS. Exclusivity shall extend to iso [CSI] not providing similar services internally, through any subsidiary, or being an owner, officer, employee, contractor, or subcontractor of any company that provides services that compete with any service offered by GCS.[2]

GCS presented no direct evidence of EPS's knowledge of this contractual provision. Mr. Stuart testified that because his contract did not contain an

---

[1] Relying on Texas appellate cases, we have previously made the same assumption. *See Amigo Broad., LP v. Spanish Broad. Sys., Inc.* 521 F.3d 472, 490 (5th Cir. 2008) ("The interfering party must have actual knowledge of the contract or business relation in question, or knowledge of facts and circumstances that would lead a reasonable person to believe in the existence of the contract or business relationship.")(internal quotation marks omitted); *Exxon Co. v. Allsup*, 808 S.W.2d 648, 656 (Tex. Ct. App. 1991) ("To establish the requisite element of intent, the plaintiff must show either that the interfering party had actual knowledge of the existence of the contract and of the plaintiff's interest in it or that the interfering party had knowledge of such facts and circumstances that would lead a reasonable person to believe in the existence of the contract and the plaintiff's interest in it."). While *Amigo Broad.* does not use the phrase "plaintiff's interest in the contract," both cases analyze the intent element by examining whether the tortfeasor knew or should have known that the contracts at issue were exclusive. *See also Top Value Enter. v. Carlson Mktg. Group*, 703 S.W.2d 806, 810 (Tex. Ct. App. 1986); *Armendariz v. Mora*, 553 S.W.2d 400, 406 (Tex. Ct. App. 1977).

[2] EPS does not appeal the sufficiency of the evidence supporting the implicit finding that CSI was bound by the 2008 contract. Accordingly, in what follows, we do not question that it was so bound. As noted above, no signed written contract was entered into evidence.

No. 11-20371

exclusivity clause he never told EPS that he was bound by one. Mr. Maley, EPS's corporate representative, testified that he had no knowledge of any exclusivity clause. There was testimony that exclusivity clauses are not typical in this industry.

For its part, GCS presented testimony that at least one person at CSI saw the exclusivity clause. Mr. Thomas Milsap, a GCS employee, testified that Kimberly Allen, a CSI employee, informed him that Mr. Stuart would not agree to the exclusivity provision. There was also evidence that other GCS agents knew their contracts contained an exclusivity clause and that EPS nevertheless tried to persuade them to stop selling for GCS and start selling for EPS. Ms. Beranek, an agent of GCS, testified that she knew that her contract with GCS included an exclusivity provision. She also testified that Mr. Maley, the CEO of EPS, tried to convince her to stop selling for GCS and start selling for EPS. GCS introduced a letter written by Beranek to an employee of GCS in which she stated, "[p]lease inform David [Homoki] that EPS is doing all it can to try and persuade Global Check's active agents to leave, even though Global Check is light years ahead of EPS in terms of dealing with agents and merchants." There was also substantial evidence that EPS and Mr. Stuart worked together to develop the EPS90 program and that EPS ultimately succeeded in persuading Mr. Stuart to switch to EPS.

GCS argues that a reasonable jury weighing this evidence could find that in the course of attempting to recruit agents from GCS, EPS reasonably should have known that GCS's contracts with its agents contained an exclusivity provision.[3]  In response, EPS contends that a finding that EPS

---

[3] GCS also relies on *Top Value* for the principle that an employee's knowledge of a contractual provision may be imputed to its employer. 703 S.W.2d at 810. *Top Value* involved

No. 11-20371

had actual knowledge of the exclusivity clause would require multiple unreasonable inferences. EPS also argues that they had no duty to "search out" the existence of an exclusivity clause.

While the evidence is not overwhelming, we think that reasonable jurors could find that these facts and circumstances should have led a reasonable company in EPS's position to believe in the existence of the exclusivity clause. It bears emphasizing that our task is not to substitute our judgment for that of the jury but to merely ensure that a reasonable interpretation of the evidence supports the verdict. *Travelers Cas. and Sur. Co. of America v. Ernst & Young LLP*, 542 F.3d 475, 484-85 (5th Cir. 2008). The evidence showed that EPS made a sustained effort to persuade GCS's agents to cease selling for GCS and to sell EPS's competing product instead. The jury was free to disbelieve Mr. Stuart's categorical denial of the existence of the exclusivity clause and Mr. Maley's testimony that EPS had no knowledge of the clause and to substitute their own understanding of what would reasonably be expected under the circumstances. Given EPS's aggressive push to recruit GCS's agents, we do not find such an inference

---

tortious interference with the exclusivity provision of a contract. The Gold Bond Stamp Company and the Big 8 stores had exclusive stamp trading license agreements. Attempting to lure the Big 8 stores away from their exclusive contracts with Gold Bond, Top Value hired a former employee of the Big 8 stores. This employee, who had knowledge of the exclusive nature of the license agreements between the Big 8 stores and Gold Bond, negotiated with the Big 8 stores on behalf of Top Value. The court of appeals upheld the jury's finding that Top Value knew or reasonably should have known that the license agreements were exclusive because: 1) the terms of the license agreements were ubiquitous in the industry; and 2) the employee hired by Top Value to negotiate with the Big 8 stores knew the license agreements were exclusive. A number of distinguishing features limit the persuasive value of *Top Value* to this case. In *Top Value* the terms of the contract were in line with the industry norm while the evidence here is that exclusivity clauses are the exception rather than the rule. Furthermore, GCS has pointed to no evidence that CSI had an employee/employer relationship with EPS.

No. 11-20371

unreasonable. The intent-to-interfere element of the tortious interference with contract claim was thus proved with sufficient evidence.[4]

**B.    Lost Profits**

EPS argues that GCS failed to present sufficiently objective data supporting the jury's finding of lost profits caused by EPS. EPS also contends that the evidence is insufficient to support a causal connection between the damage award and its actions.

**1.    Applicable Law**

The law governing what damages are recoverable is substantive, and therefore in a diversity case state law governs what damages are available for a given claim and the manner in which those damages must be proved. *Coursey v. Broadhurst*, 888 F.2d 338, 344 (5th Cir. 1989) (per curiam). The sufficiency of the evidence supporting a damages award, however, is a matter of federal procedure. *Hamburger v. State Farm Mut. Auto. Ins. Co.*, 361 F.3d 875, 884 (5th Cir. 2004). We will uphold the trial court's denial of a motion for judgment as a matter of law unless there is "no legally sufficient evidentiary basis for a reasonable jury to find for the party on that issue." *Id. (quoting Mathis v. Exxon Co.*, 302 F.2d 448, 453 (5th Cir. 2002)).

In Texas, tortious interference with contract and breach of contract typically share the same measure of damages: to place the injured party in the position he would have been had the contract been performed. *American National Petroleum Co. v. Transcon. Gas Pipe Line Co.*, 798 S.W.2d 274, 278 (Tex. 1990). Lost profits must be proved by "competent evidence" and with

---

[4] Because we find that the exclusivity clause theory is supported by sufficient evidence, we need not determine whether the jury's verdict is supported by GCS's "confidentiality clause" theory.

12

"reasonable certainty." *Texas Instruments v. Teletron Energy Mgmt.*, 877 S.W.2d 276, 278-79 (Tex. 1994) (citing *Sw. Battery Co. v. Owen*, 115 S.W. 1097, 1098-99 (Tex. 1938)). While lost profits need not be susceptible to exact calculation, there must be data from which they can be ascertained with a reasonable degree of certainty and exactness. *Id.* Whether the evidence has shown a "reasonable certainty" of lost profits is a fact-intensive determination. *ERI Consulting Eng'rs Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010). "As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. Although supporting documents may affect the weight of the evidence, it is not necessary to produce in court the documents supporting the opinions or estimates." *Id.* While "[u]ncertainty as to the fact of legal damages is fatal to recovery... uncertainty as to the amount will not defeat recovery." *Id.* (citing *Sw. Battery*, 115 S.W.2d at 1099).

### 2. Objective facts, figures, or data

EPS argues that Mr. Homoki's testimony regarding his lost profits was not competent evidence because it lacked support from objective facts, figures, or data. EPS stopped selling for GCS in December 2008. GCS alleged that it suffered lost profits in the years 2009 and 2010 and would continue to lose profits in 2011. Mr. Homoki testified that in 2006 he earned $158,000 in profits from the ARC service, twenty-seven percent (27%) of which was attributable to CSI. In 2007, he earned $210,000 in profits from the ARC program, fifty-two percent (52%) of which was attributable to CSI. In 2008, he earned $300,000 in profits, fifty-two percent (52%) of which was attributable from CSI. He did not specify whether this $300,000 figure was the amount of

No. 11-20371

profits earned solely from the ARC program.

Mr. Homoki testified that though he projected $750,000 in profits for 2009, he actually only earned $497,000 in profits, sixty-one percent (61%) of which was attributable to CSI. Once again, he failed to specify whether these profits were derived solely from sales of ARC services. Mr. Homoki projected $210,000 in profit for 2010. He testified, however, that based on his ownership of the business for sixteen years, the typical one-year duration of merchant contracts, the type of stores to which CSI was selling, and the rate of increase in the number of merchants buying his services, that he would have made between $1.1 million and $1.2 million of profits in 2010 if the actions of CSI and EPS had not caused so many merchants to discontinue use of the ARC service. These figures were corroborated by his reported income on the federal tax forms, which were put into evidence.[5]

EPS's claim that no objective facts or figures support Mr. Homoki's testimony is inaccurate.  The jury was entitled to rely on Mr. Homoki's experience in managing his business for sixteen years in weighing his testimony as to the amount of lost profits he suffered. *ERI Consulting*, 318 S.W.3d at 876 (holding that a long-time owner of a company was competent to testify regarding its profit margin). Extrapolating future profits from past profits is an accepted method of proving lost profits. *Id.* at 877 ("Contrasting revenue from a time period immediately before the period at issue is an established method of proving revenue for a lost profit damages calculation."). Any doubt as to the reliability of this evidence goes to its weight rather than its competency.

---

[5] It is undisputed that at all times material to this case GCS was not a separate business entity but rather the name under which Mr. Homoki was doing business.

### 3.   Causal Relationship between Amount of Damage Award and Defendant EPS's Actions

In addition to using competent evidence, GCS was also required to prove a causal relationship between the amount of the jury's award—$200,000 in past lost profits and $500,000 in future lost profits—and the actions of EPS. EPS contends that GCS did not put forth sufficient evidence of this causal relationship for two reasons: first, that not all of the losses caused by CSI are attributable to the actions of EPS; second, that there is no combination of numbers in the record which supports the $700,000 figure.

As to its first argument, EPS argues that the evidence showed that the bulk of GCS's lost profits were caused by actions of Mr. Stuart that had nothing to do with EPS's interference with the CSI/GCS contract. EPS points to testimony showing Mr. Stuart misrepresented the nature of the ARC service to merchants, overcharged for equipment sales to merchants, and failed to provide service to merchants after sale. Of the 1,257 merchants CSI signed up for GCS, only 52 continued to use the ARC service. Mr. Homoki testified that each of the approximately 800 merchants he contacted, upon learning of CSI's activities, complained about the lack of service and the misrepresentation of the nature of the service. In response, GCS fails to highlight any evidence showing that EPS had anything to do with these actions of CSI. EPS argues that because the number of these merchants who switched from ARC to EPS90 is so small in comparison to the number of merchants who complained about Mr. Stuart's sales tactics, GCS did not prove with reasonable certainty that EPS caused all of GCS's lost profits.

No. 11-20371

GCS counters EPS's first argument with its own contention that the trial court should have entered judgment against EPS in the amount of $2.15 million, the amount of lost profits which the jury found were caused by CSI's breach of its contractual and fiduciary obligations to GCS. GCS relies on *American National Petroleum v. Transcontinental Gas Pipe Line* for the principle that the proper measure of damages for interference with contract is the same as the measure of damages for the breach of the contract itself. 798 S.W.2d 274, 278 (Tex. 1990). Therefore, GCS contends, the proper award against EPS for tortious interference is $2.15 million for past and future lost profits.[6]

At issue in *American National Petroleum* was the requirement under Texas law that a specific jury finding of compensatory damages be made before punitive damages become available. The Texas Supreme Court held that defense counsel waived the requirement that the plaintiff obtain a specific jury finding of tort damages before receiving punitive damages. Defense counsel represented to the trial court that he did not object to the omission of a separate tort damages jury interrogatory because the amount of damages in tort would be the same as the amount in contract, the only breach at issue being the breach caused by the interference. Finding that the trial court was entitled to rely on this representation, the Texas Supreme Court upheld a judgment that included exemplary damages. *Id. American National Petroleum* does not hold that the proper amount of damages for interference with a contract is necessarily the same as the amount of damages caused by

---

[6] It is unclear how this argument explains the jury finding of $700,000 rather than $2.15 million. We ignore this difficulty because we find that *American National Petroleum* does not hold as GCS claims.

16

any breach of that contract that may have occurred at the same time. Rather, it stands for the principle that the measure of damages for interference with contract is generally the appropriate amount of damages for the contractual breach caused by the interference. The amounts were the same there for the contractual and tort causes of action because the defendant admitted that the only contractual breach at issue was caused by the interference. Damages for tortious interference with contract are necessarily limited to damages proximately caused by the act of interference and do not extend to any other breach of the contract that the contracting party happened to commit. *See Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995).

The question is thus whether the evidence shows with reasonable certainty that EPS's interference with the CSI/GCS contract caused GCS to lose profits in the amount of $700,000. We find that it does. EPS is responsible for the lost profits caused by CSI ceasing to sell for GCS. EPS is not responsible for any lost profits caused by customers discontinuing the ARC service because of CSI's misrepresentations. The amounts of the jury verdict as to CSI ($2.15 million) and as to EPS ($700,00) differ substantially. This variance reflects the jury's judgment that EPS is not responsible for all of the losses caused by CSI.

Furthermore, as to EPS's second contention that there is no combination of figures in the record from which the jury could have found that the amount of past and future lost profits attributable to EPS was $200,000 and $500,000, respectively, we note at the outset that while a jury must have an evidentiary basis for its findings, the loss need not be susceptible to exact calculation. *U.S. Renal Care, Inc. v. Jaafar*, 345 S.W.3d

600, 614 (Tex. Ct. App. 2011) (citing *Salinas v. Rafati*, 948 S.W.2d 286, 289 (Tex. 1997)); *Meaux Surface Protection, Inc. v. Fogleman*, 607 F.3d 161, 170 (5th Cir. 2010). Mr. Homoki's testimony regarding projected profits assumes both that the customers lost by CSI's misrepresentations would not have left and that CSI would have continued to sell for GCS. To arrive at an amount of damages that excludes profits lost by CSI's misrepresentations, the jury could not, and did not, rely on Mr. Homoki's projected profits. The amount of lost profits not caused by CSI's misrepresentations could, however, be fixed with reasonable certainty if the amount of yearly profit attributable to CSI signing up new customers could be determined from the record. There is sufficient evidence to support a finding that CSI contributed approximately half of GCS's profits on any given year.[7]  In 2010, a year in which CSI did not contribute to any of GCS's profits, GCS earned $210,000 in profits. Thus, one could conclude that had EPS not caused CSI to stop selling for GCS at the end of 2008, CSI would have brought in roughly $200,000 a year in profits. Mr. Homoki testified that CSI brought in no new merchants for 2009 and that merchants generally stayed on for two years. Thus, one year of past lost profits (2009) plus two years of future lost profits (2010 and 2011) would yield $600,000 in lost profits. To account for the steady upward trend in GCS's profits and CSI's contribution to those profits, the jury could have added an additional $100,000 to arrive at the $700,000 figure.[8]  While GCS's

---

[7] The average amount of profits attributable to CSI from 2006 until 2009 was forty-six percent (46%). The portion of profits attributable to CSI increased steadily from twenty-seven percent (27%) in 2006 to sixty-one percent (61%) in 2009. Total profits grew from $158,000 to $497,000 during this time period.

[8] This model assumes that CSI would have been able to obtain the same number of customers without misrepresenting the ARC service. Any extrapolation of future profits

presentation of its damages evidence was far from ideal, we think that there is sufficient evidence to support $700,000 in past and future lost profits.

## IV.     Notice of the Civil Conspiracy Claim

EPS challenges the decision of the district court to allow the conspiracy to breach fiduciary duty claim to go to the jury. EPS claims that since neither the pleadings nor the proposed pretrial order gave adequate notice of such a claim, the district court erred in submitting it to the jury.

### A.     Standard of Review and Applicable Law

EPS properly moved for judgment as a matter of law on this claim at the end of GCS's case in chief, at the close of evidence, and by post judgment motion. A court may instruct the jury on an issue only if the issue has been properly tried by the parties. *Thrift v. Estate of Hubbard*, 44 F.3d 348, 355 (5th Cir. 1995). The plaintiff is required to give fair notice in the pleadings of all claims brought against the defendant.  *Conley v. Gibson*, 355 U.S. 41, 47 (1957). So long as a pleading alleges facts upon which relief can be granted, it states a claim even if it "fails to categorize correctly the legal theory giving rise to the claim." *Dussouy v. Gulf Coast Inv. Co.*, 660 F.2d 594, 604 (5th Cir. 1981). Typically, we look to the pleadings and the pretrial order to determine whether proper notice of an issue was given before trial. *Thrift*, 44 F.3d at 355-57 (examining pretrial order and pleadings to determine whether sufficient notice of a claim of tortious interference with prospective business relations was given). In this case, however, a pretrial order was submitted by the attorneys, but not signed by the district court. Thus we do not have the benefit of the district court's pronouncement as to the issues to be tried.

requires assumptions, and we are satisfied that sufficient evidence of CSI's selling prowess was presented to support this assumption.

No. 11-20371

Instead, we must review the pleadings to determine *de novo* whether GCS gave sufficient notice of its claim to permit the claim's submission to the jury.

Civil conspiracy is a derivative tort; therefore, liability for a civil conspiracy depends on participation in an underlying tort. *Allstate Ins. Co. v. Receivable Fin. Co., L.L.C.*, 501 F.3d 398, 414 (5th Cir. 2007) (citing *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)). In order to adequately plead a claim for civil conspiracy, a plaintiff must adequately plead the underlying tort. *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 649 (5th Cir. 2007) ("If a plaintiff fails to state a separate claim on which the court may grant relief, then the claim for civil conspiracy necessarily fails."); *see also Amazon Tours v. Quest Global Angling Adventures*, 3:03cv2551-M, 2004 U.S. Dist. LEXIS 12382 at *10-11 (N.D. Tex. June 30, 2004) (holding that catch-all "incorporation by reference" statement in the civil conspiracy section of a complaint did not give defendants fair notice that any of the other torts listed in the complaint were the underlying tort).  In Texas, "[t]he elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship existed between the plaintiff and defendant; (2) the defendant breached its fiduciary duty to the plaintiff; and (3) the defendant's breach resulted in injury to the plaintiff or benefit to the defendant." *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. Ct. App. 2006).

**B.    Analysis**

The portion of GCS's complaint asserting a claim of civil conspiracy against EPS reads as follows:

I. Civil Conspiracy

136. Paragraphs 7-135 are incorporated by reference.

20

137. GCS would show that CSI and EPS have entered into a civil conspiracy to injure GCS. More specifically, Defendants have combined to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means. Defendants had (1) an end to be accomplished; (2) there was a meeting of the minds on the end or course of action; (3) one or both of Defendants committed one or more overt, unlawful acts; and (4) GCS was injured as proximate result of those acts.

138. Defendants unlawfully accessed Global Check's server to obtain Global Check's merchant contact information and used said information to switch various merchants to EPS.

139. CSI and EPS breached the security of Global Check's computer systems, defined under the Texas Penal Code §33.02.

GCS submitted a proposed pretrial order which included the following assertion under the "Propositions of Law" heading:

Breach of a fiduciary duty can be the basis of a conspiracy claim. *Paschal*, 215 S.W.3d at 450; *Remenchik*, 757 S.W.2d at 841; *Kirby v. Cruce*, 688 S.W.2d 161, 166 (Tex.App.-Dallas 1985, writ ref'd n.r.e.).

At trial, GCS withdrew its statutory computer fraud claims (paragraph 139) and its claim for interference with the contracts between GCS and merchants other than CSI.

We find that the proposed pretrial order and the amended complaint gave EPS sufficient notice that GCS was pursuing a civil conspiracy claim under a breach of fiduciary duty theory. Because neither party has disputed that fiduciary duties necessarily follow the creation of an agency relationship, for the purpose of this analysis we will assume without deciding that this is

an accurate statement of Texas law.[9] GCS's amended complaint alleges that Mr. Stuart was the agent of GCS. It also alleges that EPS conspired with Mr. Stuart to obtain GCS's confidential information and use it to GCS's detriment. Taken together, these two allegations plausibly state a claim for conspiracy to breach CSI's fiduciary duty to GCS. It does not matter that GCS did not use the words "breach of fiduciary duty" in the section of their amended complaint alleging conspiracy because GCS alleged facts upon which relief can be granted on that theory. *See Dussouy*, 660 F.2d at 604. While GCS's pleading was perhaps inartful, it adequately stated a claim for relief and EPS chose not to request clarification. Furthermore, GCS clarified in the proposed pretrial order that it was pursuing a civil conspiracy to breach fiduciary duty claim. It is true that this statement was included in the

---

[9] EPS does not argue that there was insufficient evidence to support the jury finding that a formal agency relationship existed. Neither does EPS contest that a formal agency relationship necessarily imposes fiduciary duties. We therefore express no opinion concerning whether under Texas law a principal/agent relationship always entails the creation of fiduciary duties. Neither do we attempt to define the nature and scope of those fiduciary duties, as these issues were not properly raised on appeal. EPS does, however, argue that no informal fiduciary relationship may be implied on the facts of this case, contending that Texas law does not imply a fiduciary relationship in the business context unless: 1) the fiduciary relationship existed prior to the business relationship being sued upon; and 2) the fiduciary relationship existed separate and apart from the business agreement that is the basis of the suit. *Crim Truck & Tractor Co. v. Navistar Int'l Trans.*, 823 S.W.2d 591, 593-94 (Tex. 1992); *Schlumberger Tech. Co. v. Swanson*, 959 S.W.2d 171, 176 (Tex. 1977); *Consol. Gas & Equip. Co. of America v. Thompson*, 405 S.W.2d 333, 336-37 (Tex. 1966). These cases, however, make clear that this two-step analysis is only used when an informal fiduciary relationship rather than a formal one is alleged. *See, e.g., Crim Truck*, 823 S.W.2d at 592-94 (distinguishing between formal fiduciary relationships, such as principal/agent, and informal fiduciary relationships of "confidentiality and trust"). A relationship of principal/agent is a well-established formal fiduciary relationship in Texas. *ERI Consulting*, 318 S.W.3d at 867; *Crim Truck*, 823 S.W.2d at 594 (citing *Kinzbach Tool Co. v. Corbett-Wallace*, 160 S.W.2d 509, 512 (Tex. 1942)). After being instructed that an agent is one who is authorized by the principal to transact business or manage affairs on the principal's behalf, the jury found that CSI was the agent of GCS. Accordingly, the case law cited by EPS is inapplicable.

"propositions of law" section of the proposed pretrial order rather than the "statement of the claim" section. Neither the computer fraud nor the switching merchants theories, however, were included under the civil conspiracy "propositions of law" section. GCS's decision to assert only fraud and breach of fiduciary duty theories in their proposed pretrial order put EPS on notice that they were pursuing their civil conspiracy claim under a breach fiduciary duty theory.

Furthermore, as is discussed in more detail below, the jury was not asked to fix a dollar amount of damages for this cause of action, but instead only asked to fix damages for EPS's intentional interference with the GCS contract.

## V.    Joint and Several Liability for Civil Conspiracy

The jury verdict form required special findings for the amount of past and future lost profits caused by CSI's failure to comply with its fiduciary duty. It did not ask the jury to find the amount of damages caused by the civil conspiracy to breach CSI's fiduciary duty. Neither did it ask the jury to assess the total amount of damages for which CSI, GCS, or EPS are liable. The jury found CSI caused $2.15 million in damages by breaching its fiduciary duty to GCS and that EPS conspired with CSI to breach CSI's fiduciary duty. GCS argues that the trial court erred when it refused to hold CSI and EPS jointly and severally liable for the damages caused by CSI's breach of fiduciary duty. GCS raised this issue before the trial court in a motion to amend the judgment. The court denied the motion without giving reasons.

### A.    Standard of Review and Applicable Law

A motion to amend judgment under Fed. R. Civ. P. 59(e) "must clearly

establish either manifest error of law or fact or must present newly discovered evidence and cannot raise issues that could and should have been made before the judgment issued." *Advocare Int'l LP v. Horizon Lab., Inc.*, 524 F.3d 679, 691 (5th Cir. 2008) (internal quotation marks ommitted). This motion to amend raises an issue of law; we therefore apply *de novo* review. *Dearmore v. City of Garland*, 519 F.3d 517, 520 (5th Cir. 2008). The essential elements of civil conspiracy claim are: 1) two or more persons; 2) an object to be accomplished; 3) a meeting of the minds on the object or course of action; 4) one or more unlawful, overt acts; and 5) damages as the proximate result. *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996) (citing *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)).

### B.    Analysis

GCS's argument is premised on the settled Texas rule that co-conspirators are jointly and severally liable for all acts done in furtherance of the unlawful combination. *Tompkins v. Cyr*, 202 F.3d 770, 783 (5th Cir. 2000); *In Re Enron Co. Sec., Derivative & "ERISA" Litigation*, 623 F. Supp. 2d 798, 832 (S.D. Tex. 2009); *Operation Rescue-National v. Planned Parenthood*, 975 S.W.2d 546, 561 (Tex. 1998); *Kirby v. Cruce*, 688 S.W.2d 161, 166 (Tex. Ct. App. 1985); *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925 (Tex. 1980); *Kinzbach Tool Co. v. Corbette-Wallace Co.,* 160 S.W.2d 509, 514 (1942). Damages for civil conspiracy are measured by the extent of the injury resulting from an act done pursuant to the conspiracy's common purposes, rather than from any injury caused by the unlawful agreement itself. *Schlumberger Well Surveying Co. v. Nortex Oil & Gas Co.*, 435 S.W.2d 854, 856 (Tex. 1969). GCS reasons as follows: 1) CSI breached its fiduciary duty in

furtherance of the conspiracy with EPS; 2) the jury found CSI's breach of fiduciary duty caused $2.15 million in lost profits; and 3) therefore, EPS is jointly and severally liable for $2.15 million in lost profits.

In response, EPS cites a line of Texas state cases that hold that when the plaintiff does not obtain a jury finding on what damages are caused by the conspiracy itself, joint and several liability for damages awarded by a jury for an underlying offense is not mandated unless the evidence conclusively establishes that the damages are the same for the conspiracy and the underlying offense. *Bunton v. Bentley*, 176 S.W.3d 1, 16-17 (Tex. Ct. App. 1999) *aff'd without discussion* 94 S.W.3d 561 (Tex. 2002); *THPD v. Continental Imports*, 260 S.W.3d 593, 605-08 (Tex. Ct. App. 2008) (discussing and following *Bentley*); *Belz v. Belz,* 667 S.W.2d 240, 243 (Tex. Ct. App. 1984). In *THPD*, the plaintiff obtained a jury verdict finding one defendant liable for breach of fiduciary duty, fraud, and theft. Another defendant was found to have participated in a conspiracy that damaged the plaintiff. No finding of the amount of damages caused by the conspiracy, however, was made by the jury. The court of appeals upheld the trial court's decision not to hold the co-conspirator jointly and severally liable for the damages found to have been caused by the first defendant's breach of fiduciary duty, fraud, and theft. The court relied on Texas Rule of Civil Procedure 279, which provides that unless a party submits every element of his claim to the jury, it waives that ground of recovery unless it is conclusively established by the evidence. Because the evidence did not conclusively establish that the conspiracy caused the same amount of damages as the wrongs for which the co-conspirator was found liable, the court of appeals declined to impose joint and several liability. EPS

argues that the same analysis is appropriate here.

While Texas procedural law governing what questions must be included on a jury verdict form does not apply in federal court, we find that Federal Rule of Civil Procedure 49 requires the result suggested by *THPD*, *Belz*, and *Bentley*. *Travelers Ins. Co. v. Truitt*, 280 F.2d 784, 789 (5th Cir. 1960). Rule 49(a)(3) provides:

> A party waives the right to a jury trial on any issue of fact raised by the pleadings or evidence but not submitted to the jury unless, before the jury retires, the party demands its submission to the jury. If the party does not demand submission, the court may make a finding on the issue. If the court makes no finding, it is considered to have made a finding consistent with its judgment on the special verdict.

The jury was not asked to return a general verdict with respect to EPS, nor was it asked to make a special finding regarding the amount of damages caused by the civil conspiracy. GCS waived the right to a jury trial on that issue because it failed to demand such a jury finding. We have previously overlooked the failure to submit a damages interrogatory when the evidence supporting a jury finding on an interrogatory actually presented is sufficient to support a finding on the omitted interrogatory. *See Ornelas v. Allsup's Convenience Stores, Inc.*, 40 F.3d 384, 1994 WL 652455 at *4 (5th Cir. 1994) (unpublished) (damages finding for medical expenses caused by tort claim supported judgment of same amount for claim of contract to pay for medical expenses); *Olney Sav. & Loan Ass'n v. Trinity Banc Sav. Ass'n*, 885 F.2d 266, 270 (5th Cir. 1989) (failure to submit jury interrogatory regarding defense of ratification was not error because elements of ratification paralleled elements of defense of waiver, which was submitted to jury). We are not faced with

such a situation here. There was no evidence that EPS had knowledge of, or intended to participate in, CSI's misrepresentations to merchants or its failure to service merchant ARC contracts. Rather, as is discussed in more detail above, the evidence showed that a significant portion of GCS's lost profits were caused by actions of CSI in which EPS had no part. We cannot say with any degree of certainty that the amount of damages proximately caused by the civil conspiracy in which EPS participated is the same amount caused by CSI's breach of its fiduciary duty. The jury's verdict regarding the amount of damages caused by CSI's breach of fiduciary duty does not, therefore, mandate entry of judgment in the same amount against EPS.[10]

## VI.    Conclusion

For the reasons stated above, we AFFIRM the decisions of the district court and the judgment below.

---

[10] EPS argues for the first time on appeal that the economic loss rule bars any recovery of lost profits for conspiracy to breach fiduciary duty. In light of our decision that GCS waived its right to a jury trial on the issue of damages caused by the civil conspiracy, we need not address this argument.